IAN FENTON *v.* CONNECTICUT HOSPITAL
ASSOCIATION WORKERS' COMPENSATION
TRUST ET AL.
(AC 18751)

Foti, Spear and Healey, Js.

Argued November 29, 1999—officially released May 30, 2000

*Charles D. Ray*, with whom were *Edward Gallant* and *Fiona Greaves*, for the appellant (plaintiff).

*Andrew A. Cohen*, for the appellees (defendants).

HEALEY, J. The plaintiff, Ian Fenton, appeals from the judgment of the trial court rendered on the denial of his application for an order permitting him to execute on a voluntary workers' compensation agreement (voluntary agreement) for weekly payments entered into by the plaintiff and the defendant employer[1] and approved by the trial commissioner. We affirm the judgment of the trial court.

The following facts are relevant to this appeal. In early 1995, while employed as a graphics arts teacher at a vocational school in Hamden operated by the defendant Area Cooperative Educational Services (school), the plaintiff sustained injuries when he tried to stop a fight between students. The plaintiff filed a workers' compensation claim and was granted temporary total disability benefits for an injury to his neck.

Approximately seven months later, on September 7, 1995, the defendants submitted a form 36 to the commissioner, stating that the plaintiff no longer was entitled to benefits for his neck injury. The form 36 was approved by a commissioner on September 27, 1995, thereby allowing the defendants to discontinue payments to the plaintiff. The plaintiff never sought a formal hearing to dispute this discontinuation of benefits.

In July, 1997, the defendants asked the plaintiff to sign a voluntary agreement. The voluntary agreement form lists the plaintiff's neck as the injured part of his body, but goes on to note that "[d]isc, teeth, heart, hip and upper leg are additional injuries still in dispute." The plaintiff signed the voluntary agreement on July

---

[1] The defendants are the Area Cooperative Educational Services, which operated the vocational school at which the plaintiff was employed, and the Connecticut Hospital Association Workers' Compensation Trust, the school's workers' compensation insurer.

11, 1997, and it was approved by a commissioner on July 18, 1997.

On May 1, 1998, more than two and one-half years after the approval of the form 36, the plaintiff filed in the Superior Court a pleading titled, "Motion That Execution be Ordered in Compliance With an Approved Workers' Compensation Agreement."[2] The defendants thereafter filed a "Motion to Dismiss and Objection to Plaintiff's Motion for Order of Execution."[3] The court,

---

[2] The plaintiff's motion stated in relevant part:

"The undersigned respectfully represents:

"1. The Plaintiff in the above-captioned matter is the Claimant in the ongoing workers' compensation claim, titled, *Ian Fenton v. Area Cooperative Educational Services (ACES) and The Connecticut Hospital Association Workers' Compensation Trust (CHAWCT)*, WCC File No. 300024947.

"2. The Defendants in the above-captioned matter, ACES and CHAWCT, the employer and its workers' compensation insurer, respectively, are the Respondents.

"3. On July 18, 1997, the Honorable George Waldron, Commissioner, Workers' Compensation Commission, Third District, approved a Voluntary Agreement entered into by the parties, wherein the Defendants agreed to pay to the Plaintiff the sum of Six Hundred Thirty One and 35/100 Dollars ($631.35) weekly as a Total Temporary Incapacity Benefit. . . .

"4. The Defendants acknowledged the neck injury and agreed to said weekly benefit and payment therefor, but reserved their right to deny certain additional injuries claimed by the Plaintiff.

"5. The approved Voluntary Agreement has not been reduced nor discontinued, nor has such action been approved as is required by Conn. Gen. Stat. § 31-296, by a workers' compensation commissioner to date of this motion. Said agreement continues in full force and effect.

"6. Said weekly benefit payments, as provided for in Conn. Gen. Stat. § 31-296 . . . and § 31-303, despite both oral and written demands therefor by the Plaintiff to the Respondents, have not been made. . . .

"7. A Property Execution Proceedings Application and Execution form JD-CV-5 Rev. 12-90 is on file before this court."

[3] The defendant's motion stated:

"Plaintiff is a claimant in a pending workers' compensation case who, by way of motion, has asked this Court for 'execution' of a voluntary agreement approved last July by a workers' compensation commissioner. Defendants are his employer and its insurer—the Respondents in that workers' compensation proceeding. Defendants object to plaintiff's motion and ask the Court to dismiss this case on the following grounds: (1) The Court lacks subject matter jurisdiction over this case because plaintiff has failed to exhaust his administrative remedies; (2) even if concurrent jurisdiction exists between

after a hearing, denied the plaintiff's motion in a memorandum of decision, stating, inter alia, that "[t]he matter continues to be the subject of contested proceedings before the workers' compensation commission, which has not rendered any final decision in the matter. . . . This court declines to operate as a kind of court of interlocutory appeals for workers' compensation matters."[4] This appeal followed.

At the outset, the plaintiff claims that the court, in denying his motion for an order of execution, improperly concluded that "it had no power to consider it." The defendants, however, contend that the court's decision was "statutorily left" to the court's discretion and that

this Court and the Workers' Compensation Commission, the Court should defer to the Commission under the doctrine of primary jurisdiction on a matter that it is within the Commission's expertise; and (3) plaintiff is not entitled to execution in this matter because the voluntary agreement is not a final, enforceable judgment and because the Commission has approved the discontinuation of benefits by defendants."

[4] The court's memorandum of decision stated:

"In this unusual proceeding, the plaintiff has moved for a property execution against the defendant to enforce a 'voluntary agreement' in a pending workers' compensation case.

"The plaintiff is a claimant in a pending workers' compensation proceeding as a result of an injury he claims he suffered at work in 1995. In July of 1997, the claimant and the employer reached an agreement under which the employer agreed to a basic compensation rate of $631.35 per week. The agreement on a preprinted state of Connecticut workers' compensation commission form contains a large legend at the top, which reads, THIS IS NOT A FINAL SETTLEMENT. The agreement was approved by the workers' compensation commission third district on July 18, 1997.

"The matter continues to be the subject of contested proceedings before the workers' compensation commission, which has not rendered any final decision in the matter.

"Nonetheless, the plaintiff now comes to this court requesting that it issue a property execution for accrued, unpaid benefits under the agreement, notwithstanding the continued pendency of the case before the commission.

"This court declines to operate as a kind of court of interlocutory appeals for workers' compensation matters. The plaintiff has failed to point this court to any appellate or, indeed, trial court decision which approves the procedure he is urging the court to undertake.

"The motion that execution be ordered is denied."

its exercise of that discretion should not be disturbed unless that discretion was abused. We agree with the defendants.

In making his argument on this threshold issue, the plaintiff maintains that the court had "not only the right, but also the duty, to exercise its jurisdiction and render a decision on the merits of [his] application to enforce the final and binding voluntary agreement," as it had sole jurisdiction over the matter and its jurisdiction had been invoked properly. He also argues that the court's authority to hear and determine the merits of his motion is derived from two provisions of the Workers' Compensation Act (act), General Statutes § 31-275 et seq., i.e., General Statutes §§ 31-296[5] and

[5] General Statutes § 31-296 provides in relevant part: "If an employer and an injured employee, or in case of fatal injury his legal representative or dependent, at a date not earlier than the expiration of the waiting period, reach an agreement in regard to compensation, such agreement shall be submitted in writing to the commissioner by the employer with a statement of the time, place and nature of the injury upon which it is based; and, if such commissioner finds such agreement to conform to the provisions of this chapter in every regard, he shall so approve it. A copy of the agreement, with a statement of the commissioner's approval thereof, shall be delivered to each of the parties and thereafter it shall be as binding upon both parties as an award by the commissioner. The commissioner's statement of approval shall also inform the employee or his dependent, as the case may be, of any rights the individual may have to an annual cost-of-living adjustment or to participate in a rehabilitation program under the provisions of this chapter. He shall retain the original agreement, with his approval thereof, in his office and, if an application is made to the superior court for an execution, he shall, upon the request of said court, file in the court a certified copy of the agreement and his statement of approval thereof. Before discontinuing or reducing payment on account of total or partial incapacity under any such agreement, the employer, if it is claimed by or on behalf of the injured person that his incapacity still continues, shall notify the commissioner and the employee, by certified mail, of the proposed discontinuance or reduction of such payments, with the date of such proposed discontinuance or reduction and the reason therefor, and, such discontinuance or reduction shall not become effective unless specifically approved in writing by the commissioner. The employee may request a hearing on any such proposed discontinuance or reduction within ten days of receipt of such notice. Any such request for a hearing shall be given priority over requests for hearings on other matters. The commissioner shall not approve any

31-300.[6] He contends further that "[t]aken together, these statutes allow a claimant to enforce accrued but unpaid benefits that are due under an approved voluntary agreement, either by an action at law or by execution, in the same manner as a Superior Court judgment."

We begin by noting that the Superior Court has subject matter jurisdiction over the issuance of executions on a judgment of the Superior Court. For example,

such discontinuance or reduction prior to the expiration of the period for requesting a hearing or the completion of such hearing, whichever is later. In any case where the commissioner finds that an employer has discontinued or reduced any payments made in accordance with this section without the approval of the commissioner, such employer shall be required to pay to the employee the total amount of all payments so discontinued or the total amount by which such payments were reduced, as the case may be, and shall be required to pay interest to the employee, at a rate of one and one-quarter per cent per month or portion thereof, on any payments so discontinued or on the total amount by which such payments were reduced, as the case may be, plus reasonable attorney's fees incurred by the employee in relation to such discontinuance or reduction. Such notice of intention to discontinue or reduce payments shall be in substantially the [form included in the statute] . . . .

\* \* \*

"The employee may request a hearing by the compensation commissioner on the discontinuance or reduction set forth in this notice within ten days of receipt of this notice."

[6] General Statutes § 31-300 provides in relevant part: "As soon as may be after the conclusion of any hearing, but no later than one hundred twenty days after such conclusion, the commissioner shall send to each party a written copy of his findings and award. The commissioner shall, as part of the written award, inform the employee or his dependent, as the case may be, of any rights the individual may have to an annual cost-of-living adjustment or to participate in a rehabilitation program under the provisions of this chapter. He shall retain the original findings and award in his office. If no appeal from his decision is taken by either party within ten days thereafter, such award shall be final and may be enforced in the same manner as a judgment of the Superior Court. The court may issue execution upon any uncontested or final award of a commissioner in the same manner as in cases of judgments rendered in the Superior Court; and, upon the filing of an application to the court for an execution, the commissioner in whose office the award is on file shall, upon the request of the clerk of said court, send to him a certified copy of such findings and award. . . ."

under General Statutes § 52-350f authority is given for the enforcement of a money judgment as applied to the act. Section 31-296, titled, "Voluntary Agreements," provides in relevant part: "[The workers' compensation commissioner] shall retain the original [voluntary] agreement, with his approval thereof, in his office and, if an application is made to the superior court for an execution, he shall, upon the request of said court, file in the court a certified copy of the agreement and his statement of approval thereof. . . ." In relevant part, § 31-300 provides that in the event that either party does not appeal from the commissioner's decision within ten days after the decision has been made, "such award shall be final and *may* be enforced in the same manner as a judgment of the Superior Court. The [Superior] court *may* issue execution upon any uncontested or final award of a commissioner in the same manner as in cases of judgments rendered in the Superior Court; and, upon the filing of an application to the court for an execution, the commissioner in whose office the award is on file *shall*, upon the request of the clerk of said court, send to him a certified copy of such findings and award. . . ." (Emphasis added.) There is no question, therefore, that the Superior Court has subject matter jurisdiction in this matter and may issue an order of execution as provided for in § 31-300. The Superior Court "has 'general subject matter jurisdiction. *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 195, 629 A.2d 1116 (1993).' " *Second Injury Fund* v. *Lupachino*, 45 Conn. App. 324, 345, 695 A.2d 1072 (1997).

"The construction of a judgment is a question of law for the court. See 49 C.J.S., Judgments § 436; see also *Grasso* v. *Frattolillo*, 111 Conn. 209, 212, 149 A. 838 (1930); see generally *Jordan, Marsh & Co.* v. *Patterson*, 67 Conn. 473, 479, 35 A. 521 (1896). As a general rule, judgments are to be construed in the same fashion as

other written instruments. *Scoville* v. *Scoville*, 179 Conn. 277, 282, 426 A.2d 271 (1979) (*Healey, J.*, dissenting); *Grasso* v. *Frattolillo*, supra, 212; 46 Am. Jur. 2d, Judgments § 73; 49 C.J.S., Judgments, supra; 3 Stephenson, Conn. Civ. Proc. (Tait & Adomeit 1978) § 351e. The determinative factor is the intention of the court as gathered from all parts of the judgment. *Scoville* v. *Scoville*, supra; 3 Stephenson, supra. The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. *Christiano* v. *Christiano*, 131 Conn. 589, 592, 41 A.2d 779 [1945]. *Garguilo* v. *Moore*, 156 Conn. 359, 365, 242 A.2d 716 (1968); *Nauss* v. *Pinkes*, 2 Conn. App. 400, 411, 480 A.2d 568 [cert. denied, 194 Conn. 808, 483 A.2d 612] (1984); see also *Viglione* v. *Viglione*, 171 Conn. 213, 217, 368 A.2d 202 (1976); 46 Am. Jur. 2d, Judgments, supra; 49 C.J.S., Judgments, supra. Effect must be given to that which is clearly implied as well as to that which is expressed. *Cooper* v. *Cooper*, 158 N.W.2d 712, 713 (Iowa 1968), quoting *Whittier* v. *Whittier*, 237 Iowa 655, 663, 23 N.W.2d 435 (1946). The judgment should admit of a consistent construction as a whole. *Riley* v. *Liquor Control Commission*, 153 Conn. 242, 245, 215 A.2d 402 (1965)." (Internal quotation marks omitted.) *Lashgari* v. *Lashgari*, 197 Conn. 189, 196–97, 496 A.2d 491 (1985).

It is evident that the court was aware that the agreement stated, in prominent print, "THIS IS NOT A FINAL SETTLEMENT," and that the matter continued to be pending before the commissioner, who, as the court stated in its memorandum of decision, "[had] not rendered any final decision in the matter." This being so, the court further stated that "this court declines to operate as a kind of court of interlocutory appeals for workers' compensation matters." The "NOT A FINAL SETTLEMENT" language is that of a "disclaimer," which has been defined as a " 'refusal to recognize the existence of an obligation. Ballentine's Law Dictionary

(3d Ed. 1969).'" *Mattegat* v. *Klopfenstein,* 50 Conn. App. 97, 103, 717 A.2d 276, cert. denied, 247 Conn. 922, 722 A.2d 810 (1998). Significantly, this language was on the very document that the plaintiff claims embodies the "defendants' admitted liability" for his neck injury, "which had been conclusively established by execution and approval by the voluntary agreement." The plaintiff, however, has not demonstrated the impact of this "NOT A FINAL SETTLEMENT" language.

Our standard for review of the court's action is whether it abused its discretion in denying the issuance of the requested execution. *Morgan* v. *East Haven,* 208 Conn. 576, 588, 546 A.2d 243 (1988); *Goodlatte* v. *Liberty Mutual Ins. Co.,* 27 Conn. Sup. 382, 385, 239 A.2d 546 (1967). It is true that the Superior Court was the appropriate entity to grant or deny the execution, and in being the appropriate entity to do so it had discretion. This is because the procedural vehicle for allowing the Superior Court to grant or deny an order of execution is found in § 31-300 of the act. Not only does § 31-300 use the words "shall" and "may" interchangeably in a number of places, but those words also appear in the very portion of § 31-300 that states that the Superior Court "may" issue an order of execution in an appropriate case. "[The] use of 'shall' and 'may' in the same statute, which is commonly mandatory and directory in connotation, is a factor that evidences affirmative selectivity of terms with specific intent to be distinctive in meaning. The words 'shall' and 'may' must then be assumed to have been used with discrimination and a full awareness of the difference in their ordinary meanings. *Jones* v. *Civil Service Commission,* 175 Conn. 504, 509, 400 A.2d 721 (1978); *Shulman* v. *Zoning Board of Appeals,* 154 Conn. 426, 428–29, 226 A.2d 380 (1967)." (Internal quotation marks omitted.) *Builders Service Corp.* v. *Planning & Zoning Commission,* 208 Conn. 267, 304–305, 545 A.2d 530 (1988). Our Supreme Court,

in an appeal involving an application for an order of execution under § 31-300, stated that a trial judge has the authority to deny an application for an order of execution. *Morgan* v. *East Haven*, supra, 588.[7] The deferential "may" employed by the legislature in the relevant portion of § 31-300 referred to recognizes the legislative intent to permit the Superior Court the discretion to grant or deny such an application.

The court in this case did exercise its discretion. In recognizing that this matter continues to be the subject of contested proceedings before the commissioner, the court stated in its memorandum of decision that it "declines to operate as a kind of court of interlocutory appeals." We note the significance of that statement when taken in context. First, in stating that it "declines to operate as a kind of court of interlocutory appeals," the court indicated that it had affirmatively acted in the matter before it and demonstrated that it exercised the discretion that it has. The court then used that discretion to deny the motion for execution. Next, the court refused to act in an "interlocutory" fashion. Black's Law Dictionary (7th Ed. 1999) defines "interlocutory" to mean "not constituting a final resolution of the whole controversy." The court was asked by the plaintiff to act favorably in a matter in which it was patently declared on the face of the document that the agreement was "NOT A FINAL SETTLEMENT."[8] "Judges are presumed to know the law . . . and to apply it correctly."

---

[7] In *Morgan*, the court stated that although the issuance of an execution *ordinarily* is a ministerial act, this should "not be construed to mean that it is *always* a ministerial process." (Emphasis in original; internal quotation marks omitted.) *Morgan* v. *East Haven*, supra, 208 Conn. 588.

[8] Although the court did not explicitly develop in its memorandum of decision the meaning of the "NOT A FINAL SETTLEMENT" language, it is clear that the court perceived that the matter for which execution was sought was intermediate and tentative, as opposed to final. Our analysis, as we discuss in this opinion, leads us to conclude that the agreement lacked the legal quality the plaintiff contends it has.

(Internal quotation marks omitted.) *Colonial Carpets, Inc.* v. *Carpet Fair, Inc.*, 36 Md. App. 583, 591–92, 374 A.2d 419 (1977). We can, therefore, presume that the court knew that the act provided the opportunity for further proceedings with potential relief for the plaintiff. Such potential appropriately may be considered in the matter before us when we remember that the construction of a judgment not only involves the consideration of "circumstances surrounding the making of the judgment," but also that "[e]ffect must be given to that which is clearly implied as well as to that which is expressed." (Internal quotation marks omitted.) *Lashgari* v. *Lashgari*, supra, 197 Conn. 196–97. It can, therefore, be said that in adverting to the interlocutory or nonfinal nature of the voluntary agreement for which the plaintiff sought an order of execution, the court implied, and we believe correctly, that the act itself provided the relief the plaintiff sought, which first needed to be exhausted.

Turning first to General Statutes § 31-278 of the act, which is titled, "Power and duties of commissioners," it provides in relevant part that "[t]he Superior Court, on application of a commissioner or the chairman . . . *may enforce, by appropriate decree or process*, any provision of the chapter or any proper order of a commissioner or this chairman rendered pursuant to any such provision. . . ." (Emphasis added.) The legislative choice to include the word "process" is instructive when accepted definitions of that term are considered. Its use in § 31-278 is strongly suggestive of another avenue by which a plaintiff may utilize the act in the first instance in an enforcement context. General Statutes § 31-323 of the act provides that under certain circumstances a "commissioner may issue a writ of attachment [against employers who have not paid benefits due under the act] in the manner and form of writs of attachment in civil actions and shall be vested with

the same jurisdiction as authorities authorized to issue writs of attachment in civil actions. . . ."

The plaintiff claims that the legislature has provided the remedy in § 31-300, which permits him to go directly into the Superior Court to seek an order of execution on the voluntary agreement without any necessity that he consider doing anything further under the act. We disagree.

If we assume for the moment that the voluntary agreement is of the quality and kind that the Superior Court could properly consider to be the subject of an execution, the plaintiff could have addressed the commissioner under § 31-278 and asked that the commissioner make an "application" to the Superior Court to enforce his order. It is no answer for the plaintiff to claim, as he does, that the legislature provided the route he sought to take. Rather, it should be pointed out that there are good reasons for exhausting available administrative remedies under the act before seeking judicial review. "Foremost among those reasons is the policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the [workers' compensation commissioner's] findings and conclusions." *Silverman* v. *New Haven*, 19 Conn. App. 360, 366, 562 A.2d 562, cert. denied, 212 Conn. 812, 565 A.2d 537 (1989). "We have recognized that a party aggrieved by a decision of an administrative agency may be excused from exhaustion of administrative remedies if: recourse to the administrative remedy would be futile or inadequate . . . ." (Internal quotation marks omitted.) *Johnson* v. *Statewide Grievance Committee*, 248 Conn. 87, 103, 726 A.2d 1154 (1999). The plaintiff's remedy offered by § 31-278 was adequate; invoking it would have put him in the position to get the relief he wanted, i.e., money.[9]

_____

[9] It is not quite correct, therefore, to state, as the plaintiff does, that the commissioner had "absolutely no authority to grant the relief [the plaintiff] requested" because an application for enforcement of the plaintiff's claim

After all, "It is not the [plaintiff's] preference for a particular remedy that determines whether the remedy . . . is adequate . . . and an administrative remedy, in order to be 'adequate,' need not comport with the [plaintiff's] opinion of what a perfect remedy would be." *Connecticut Mobile Home Assn., Inc.* v. *Jensen's, Inc.* 178 Conn. 586, 590, 424 A.2d 285 (1979); see *Hunt* v. *Prior*, 236 Conn. 421, 434, 673 A.2d 514 (1996); *Savoy Laundry, Inc.* v. *Stratford*, 32 Conn. App. 636, 642, 630 A.2d 159, cert. denied, 227 Conn. 931, 632 A.2d 704 (1993).

The plaintiff also asserts that the court "did not understand the role it was being asked to assume." He claims that the court was not being asked to engage in "appellate" review of the voluntary agreement, but rather, the plaintiff sought enforcement only of what was "a final and binding agreement between the parties . . . which under [*McIntyre* v. *Standard Oil Co. of New York, Inc.*, 126 Conn. 491, 12 A.2d 544 (1940)] was enforceable as to payments that had already accrued but had not yet been paid." The premise of his claim, the plaintiff argues, "was that the voluntary agreement represented a final, binding contract between the parties, for which he sought an execution on amounts that had already become due, but had not yet been paid."

On the other hand, the defendants claim that (1) the voluntary agreement is not an enforceable final judgment and is not subject to an order of execution, as was the case in *McIntyre*, and (2) even if a voluntary agreement may create a right to payment in some circumstances, they have no obligation to pay here because the form 36 already had been approved by the commissioner and remained legally viable and, thus, rendered the voluntary agreement ineffective.

under § 31-278 of the act, if sought and favorably acted on by the Superior Court, ultimately would yield the same result as an execution rendered by the Superior Court, i.e., money for the plaintiff.

Certain additional circumstances should be set out. In addition to the language in the voluntary agreement, approved by the commissioner on July 18, 1997, and which prominently states in boldface print the caveat, "THIS IS NOT A FINAL SETTLEMENT," other language in the document is significant. The voluntary agreement also contains a section conspicuously titled, "IF INJURY CAUSES,"[10] which plainly is in "condition precedent" language. There also is a space in the document for the specific, basic weekly compensation rate depending on the type of incapacity or injury, which clearly is subject to and conditioned on the "IF INJURY CAUSES" language. On this printed form the amount $631.35 is printed in box 17 as the weekly "basic compensation." Box 17, in printed form, also contains after "$631.35 per week" the following: "Employer pays to employee (Section 31-307). . . ." We note that § 31-307 (a), titled, "Compensation for total incapacity," contains this prefatory language: "*If any injury* for which compensation is provided under the provisions of this chapter *results in total incapacity to work*, the injured

---

[10] This "If Injury Causes" section appears on both sides of the "THIS IS NOT A FINAL SETTLEMENT" form and is identical on both sides of the form except for the box numbers. This section was as follows:

"IF INJURY CAUSES:

"17. TOTAL INCAPACITY/BASIC COMPENSATION RATE: $631.35

"Per Week: Employer pays to employee, (Section 31-307). Line 3, reverse side.

"18. PARTIAL INCAPACITY

"Per Week: Employer to pay 80% of the difference between present net weekly wage in employee's usual work and employee's post injury net weekly wage (Section 31-308). Line 4, reverse side.

"19. SPECIFIC INJURY/BASIC COMPENSATION RATE

"Involving permanent - total or permanent partial loss or loss of use of particular members or parts of the body, resulting from injury. EMPLOYER TO PAY TO EMPLOYEE amount limited at left in addition to the payments provided in 17 and 18, after maximum improvement for the number of weeks listed below, Section 31-308. Line 5, reverse side.

"20. NO. OF WEEKS

"21. SPECIFIC INJURY/DATE MAXIMUM IMPROVEMENT

"(Fill in 20 and 21 only when specific injury is included)"

employee shall be paid a weekly compensation equal to . . . ." (Emphasis added.) This language from § 31-307 underscores the caveat of the "IF INJURY CAUSES" section of the voluntary agreement.

The voluntary agreement was signed on July 7, 1997, and approved by the commissioner on July 18, 1997. The voluntary agreement includes no provision for the payment of any fixed sum, but rather, sets out the applicable weekly benefit rate, i.e., $631.75 "IF INJURY CAUSES" total incapacity. Causation still remains to be proven by the plaintiff as to his neck injury. On September 27, 1995, the commissioner approved the defendants' previously filed form 36, in which they had sought to discontinue payment of benefits to the plaintiff. In the form 36, the defendants alleged that the plaintiff had been released to return to light duty work on July 10, 1995, and was, therefore, no longer entitled to receive temporary total benefits. There is nothing in the record before the court to indicate that the form 36 has been revoked, withdrawn, amended or changed in any fashion by a commissioner. The plaintiff, although he was entitled to do so under § 31-296, never requested a hearing on the defendants' discontinuance of payments.

In *McIntyre*, the employee entered into a "voluntary compensation agreement" with the employer for $6800, which was agreed to be "an advance commuted payment of compensation into a single lump sum." (Internal quotation marks omitted.) *McIntyre* v. *Standard Oil Co. of New York, Inc.*, supra, 126 Conn. 492–93. The commissioner approved the agreement. Id., 493. Subsequently, the employee complained to the commissioner that the employer had not paid pursuant to the terms of the agreement. Id. Still later, the employer discharged the employee and paid him certain moneys pursuant to

a "voluntary special allowance,"[11] which the employer claimed was in place of the $6800 due under the earlier compensation agreement. Id., 493–94. The employee then brought an action against the employer, alleging that the earlier compensation agreement and the voluntary allowance that the employer itself decided to award him were two separate transactions and that he was entitled to receive the compensation award as well as the voluntary special allowance. Id., 494. Our Supreme Court affirmed the employee's entitlement to both. In so doing, the court stated that under the statutes, the $6800 compensation agreement was a commutation of the employee's compensation for the entire period involved and that immediate payment of the commuted lump sum was contemplated. Id., 496. The *McIntyre* court then went on to state: "An obvious purpose of commutation into a single lump sum is in effect an immediate determination of the rights of the employee and the liability of the employer as to the entire compensation by fixing the amount to be paid and accepted, with a single payment thereof instead of the usual weekly instalments or other periodical payments extending over the compensation period, due allowance, as by discount, being made for the advantages accruing thereby to the employee. When, as here, the award is so commuted and made presently payable, it thereupon becomes a final judgment. *O'Keefe* v. *Elmer Automobile Co.*, [112 Conn. 370, 379, 152 A. 280 (1930)]. As such it is enforceable as provided in § 5251 of the General Statutes, at least in the absence of motion to reopen it." *McIntyre* v. *Standard Oil Co. of New York, Inc.*, supra, 126 Conn. 496; see also *Hyatt* v. *Milford,*

---

[11] The "voluntary special allowance" was given to the plaintiff in accordance with a custom of many years, pursuant to which the defendant made such payment to those employees "whose services had commended themselves to their superiors and whose employment was terminated without fault on their side." *McIntyre* v. *Standard Oil Co. of New York, Inc.*, supra, 126 Conn. 493.

26 Conn. App. 494, 498, 600 A.2d 5 (1991), appeal dismissed, 224 Conn. 441, 619 A.2d 450 (1993) (following *McIntyre*). *McIntyre* thereby concluded that the compensation agreement was a final judgment entitled to be enforced under § 5251 as a final judgment.

That is not the situation in this case. Here, the plaintiff received neither a commuted and currently payable monetary award nor a lump sum award. *McIntyre*, therefore, does not control. What the plaintiff and the defendants agreed to was that the plaintiff had a neck injury that arose out of and in the course of his employment, and a setting of the weekly rate of his compensation "if injury causes total incapacity" of his neck. That is what the commissioner ordered on a form that not only was marked, "NOT A FINAL SETTLEMENT," but which also, not once, but twice, stated the caveat, "If injury causes total disability." By signing the agreement, the defendants were not agreeing to be liable for any total incapacity of the plaintiff's neck, as causation remained to be proven by the plaintiff. Rather, the defendants claim that they sought the execution of the "NOT A FINAL SETTLEMENT" agreement for the purpose of avoiding any waiver or threatening of their right to transfer liability for the neck injury to the second injury fund, pursuant to General Statutes § 31-349 (b).[12] The defendants claim further that the document involved no agreement "whatsoever . . . that the plaintiff was presently incapacitated because of his neck injury and certainly not that plaintiff would receive payment for such an alleged incapacity."

---

[12] General Statutes § 31-349 (b) provides in relevant part: "As a condition precedent to the liability of the Second Injury Fund, the employer or its insurer shall: (1) Notify the custodian of the fund . . . no later than ninety days after completion of payments for the first one hundred and four weeks of disability . . . of its intent to transfer liability for the claim to the Second Injury Fund; (2) include with the notification . . . (C) copies of all findings, awards and approved voluntary agreements . . . and (F) such other material as the custodian may require. . . ."

The plaintiff, on the other hand, maintains that on July 7, 1997, nearly two years after the discontinuation of his benefits,[13] the defendants, through counsel, "revived" his entitlement to benefits by proposing the voluntary agreement to compensate him for his neck injuries. Under this agreement, the plaintiff argues, the defendant employer agreed to pay him $631.35 per week. Despite approval of the voluntary agreement on July 18, 1997, by the commissioner, according to statute, the defendants, notwithstanding repeated demands[14] by the plaintiff, made no payments. Accordingly, the plaintiff sought an order of execution in the Superior Court, the denial of which is before us now.

This case does not present, as the plaintiff claims, a voluntary agreement that is a final and enforceable judgment. Moreover, it does not, as the plaintiff claims, fit within the rationale of *McIntyre* to be the subject of consideration for an order of execution. In *McIntyre*, it expressly appeared from the voluntary agreement that there was a commutation of compensation into a single lump sum and that immediate payment was contemplated such that there was a final judgment. *McIntyre* v. *Standard Oil Co. of New York, Inc.*, supra, 126 Conn. 496. That is not so in this case. The plaintiff, quite apart from his not properly explaining the "NOT A FINAL SETTLEMENT" language in the context of the entire voluntary agreement, also has not persuasively demonstrated the impact of the "IF INJURY CAUSES" language, which appears not once, but twice in the voluntary agreement. In addition, the plaintiff has not demonstrated by analysis that the "IF INJURY CAUSES" language does not mean exactly what it says,

---

[13] We find it significant that the record does not disclose, since the approval of the form 36 in September, 1995, that the plaintiff filed with the commissioner any motion to set aside or modify that approval.

[14] There is no indication on the record before us, however, that any of those demands were made in the forum of the workers' compensation commissioner.

that is, that the causation element of the injury still remains to be proven. The word "if" is "[a] word implying a condition; showing that the expectation of a fulfillment is uncertain, and presupposing that it may not occur." Ballentine's Law Dictionary (3d Ed. 1969); see 17A Am. Jur. 2d, Contracts § 466 (1991). The word "if," as used in this context, unambiguously resonates in the sense of that which is precedent to the right and duty to immediate performance; it is that which is not at all final. The plaintiff suggests that he is entitled to have an order of execution issue so that he may obtain the payments that have "accrued" and constitute the amount of his final judgment. This is not persuasive because that which is "accrued" is that which "[comes] into existence as an enforceable claim or right"; Black's Law Dictionary (7th Ed. 1999); and the plaintiff, at this juncture, has not proven any enforceable claim or right.

Next, the plaintiff dismisses the significance of the form 36, which the commissioner approved *before* the execution of the voluntary agreement. He does this by simply stating, without analysis or authority, that the defendants "revived [his] entitlement to benefits by proposing a voluntary agreement to compensate him for his neck injuries." Relying on § 31-296-1 of the Regulations of Connecticut State Agencies, the plaintiff argues that "[a]s a matter of contract law—based on the specific terms of the agreement—the voluntary agreement in this case *conclusively established* the defendants' acceptance of liability for payments based on [the plaintiff's] neck injuries." (Emphasis added.) See Regs., Conn. State Agencies § 31-296-1.[15] We do not interpret

---

[15] Section 31-296-1 of the Regulations of Connecticut State Agencies provides: "A voluntary agreement shall be prepared by the employer or his insurer in connection with all cases concerning which there is no dispute that the claimant suffered an accident and injury arising out of and in the course of his employment causing either temporary partial or temporary total disability beyond the three-day waiting period. The voluntary agreement shall be submitted to the claimant for execution by him and forwarded by the employer or its insurer to the commissioner having jurisdiction within

§ 31-296-1 as does the plaintiff. Rather, we read it to mean that the "voluntary agreement" mentioned in the regulation is to be prepared in cases where there is no dispute that the employee has "suffered an accident and injury arising out of and in the course of his employment causing either temporary partial or temporary total disability beyond the three-day waiting period." Id. In this case, the execution of the voluntary agreement means that the defendants conceded that the plaintiff injured his neck during the "accident" involved and that it caused some disability in the past beyond the three-day waiting period. It does not conclusively establish the defendants' acceptance of liability for the plaintiff's neck injury.

Furthermore, the plaintiff has not demonstrated how the execution of the voluntary agreement has "revived" his claimed entitlement to benefits. He has not demonstrated that the commissioner's order approving the form 36 prior to the voluntary agreement has been somehow revoked, amended, set aside or in any way diminished in its legal viability from that which it possessed when originally entered. In recognizing the conclusivity that it was according to the approval of a discontinuance of or a reduction in benefits by means of an approved form 36, the legislature in § 31-296 imposed strict requirements of notification on the employer, the opportunity for the employee to request a hearing on the proposed discontinuance or reduction within ten

three weeks after the employer has actual knowledge of the accident and that the disability will extend beyond the three-day waiting period. Failure of the employer to furnish the insurer with a wage statement for the computation of the proper compensation rate shall not excuse failure to comply with the provisions of this section. Failure or inability of the employer to secure a medical report shall not excuse failure to file a voluntary agreement whenever the employer or the insurer has actual knowledge, or with reasonable diligence could have secured knowledge, that the claimant was actually disabled by a compensable accident. Noncompliance with this section is subject to the penalty provided in section 31-288 of the general statutes."

days after receiving notice and mandated that any such request for a hearing "be given priority over requests for hearings on other matters. . . ." General Statutes § 31-296. The plaintiff did not request a hearing before the commissioner. The plaintiff cannot bypass the effect of the duly ordered approval of the form 36, which operates to discontinue his benefits. This effect of the form 36 supports the defendants' claim that the execution of and later approval by the commissioner of the 1997 voluntary agreement were for the purpose of preserving their ability to transfer their potential liability to the second injury fund.

The judgment is affirmed.

In this opinion the other judges concurred.