[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Department of Children and Families (DCF) brought this petition to terminate the parental rights of the respondent Carol w. with respect to her five children. Before trial, DCF withdrew its petition as to three of the children and proceeded only with respect to two children, Rashana W. and Rysene. At the conclusion of the trial, the court issued its judgment from the bench, dismissing the petition as to Rashana and granting it as to Rysene. Pursuant to Practice Book § 6-1[1], the court now issues this memorandum of decision with respect to the termination of the respondent's parental rights as to Rysene, having ordered and signed the transcript as modified and supplemented by this memorandum.
The respondent was born on July 12, 1967. Poverty, neglect and sexual molestation marked her childhood. She has never been married and was never employed before 1999. She has five children by five different men, three of whom abused drugs or liquor. All of her prior relationships have been abusive. The respondent now lives with a sixth man, James J., who, she says, does not drink on weekdays but drinks a dozen beers on Saturdays. Her relationship with J. has been marked by violence. J. beat the respondent in the presence of her children and yelled at the CT Page 8999 children. According to the social study, the respondent stated to DCF that "she was raised by getting a `whoppin' when she did something wrong, and stated this is the way she is going to [parent]." She beats her children when they misbehave.
Rysene was born to the respondent on March 1992. Rysene's father's parental rights have been terminated and are not at issue here. On October 21, 1992, Rysene was adjudicated neglected and placed in DCF's care. The commitment was revoked on July 11, 1995 and Rysene was returned to his mother. However, Rysene again came into DCF's care on February 4, 1998. He was adjudicated neglected and committed to the custody of DCF on July 29, 1998. On that date, the court issued specific steps to facilitate the return of Rysene to the respondent. On October 25, 1999, the court found that continued efforts at reunification no longer were appropriate. On March 20, 2000, DCF filed this petition to terminate the respondent's parental rights. DCF claims that the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Rysene, she could assume a responsible position in his life. General Statutes (Rev. 1999) § 17a-112 (c)(3)(b), now § 17a-112 (j)(3)(B). The overarching issues concern the extreme and long-standing domestic violence in the respondent's home and her inability to parent a child such as Rysene who has special needs.
Allen Kalisher was the first witness. He was the DCF social worker from June 1998 to July 2000. Kalisher testified that in 1998, while Rysene and his siblings were still living with the respondent, he referred the respondent to a parenting course, a counseling program and the Family Violence Outreach Program. The respondent said she did not complete the parenting classes because she had taken them in the past and found them of no use to her. She attended the Family Violence Outreach Program but was not successful in completing it. The respondent did not, at any time prior to the filing of the termination petition, complete a domestic violence program, even though Kalisher told her she had to address that problem.
Kalisher testified that for several years the respondent has resided with James J. There has been continuous and intense domestic violence between the couple. Rysene and his siblings harbor extreme fear of J. Still, the respondent has no intention of removing him from the home. The respondent has minimized or outright denied the domestic violence in the home and never recognized its significance to the children.
Rysene has been in the same foster home for nearly two years. He is a special education student and is in counseling. He does not want to return home. His visits with the respondent were terminated in March 2000 after CT Page 9000 DCF consulted with his therapist. When he visited with the respondent in 1999, Rysene would act out violently against the respondent and referred to his foster mother as his real mother. He last saw his mother at a psychological evaluation in May 2000. However, he has continued to have sibling visits. of his nine years, Rysene has spent only three with his mother.
Dr. Debra Megeehan, Ph. D., who holds a post-graduate degree in child development, testified that she provided services to Rysene from September 1998 to August 2000. Rysene has serious behavioral problems, severe tantrums, and Attention Deficit Hyperactivity Disorder (ADHD) with an overlay of anxiety and aggression. He takes medication for his ADHD. Dr. Megeehan had fourteen sessions with Rysene and three with his foster parents. In counseling, Rysene resisted discussing the respondent because it was so difficult for him to do so. Dr. Megeehan suspended Rysene's counseling in 2000 because he was doing well.
Dr. Megeehan stated that Rysene needed contact with the respondent and with his siblings, but needed permanency more. He is an emotionally fragile child but is in an excellent foster home. He will need counseling services in the future.
Dr. Andrew Gibson, Ph. D., Director of Intensive Behavior Management Training (IBMT) attempted to provide the respondent with what he characterized as an "end of the line program" to enable her to remove the domestic violence in her life and acquire basic parenting skills. The respondent agreed to the program which entailed weekly visits by Dr. Gibson to the home.
Gibson ultimately recommended that the program be terminated after only six weeks because the respondent had been misrepresenting the extent to which domestic violence still afflicted the home. In Dr. Gibson's opinion, the respondent's limitations were too substantial to succeed in the program and overcome her domestic violence. She was too intellectually limited or too emotional. She lived too impulsively. In Dr. Gibson's opinion, the respondent was also unable to learn how to deal with difficult children.
In correspondence to DCF social worker Allan Kalisher, Dr. Gibson stated that the respondent's limitations were too substantial for her to make progress and that she had "difficulty focusing, listening and taking responsibility for events. . . . IBMT is a very basic program; parents who fail at it demonstrate a failure of basic parenting, because they apparently can not learn self-control, emotional distancing, patience or acceptance. I think that failure is an admission that the fundamentals of parenting can not currently be achieved by a client." CT Page 9001
The current social worker testified that the respondent continues to live with J. Rysene still attends family visits with his siblings, but has no scheduled visitation with the respondent. Because he needs loving parents and a stable living environment, the plan for Rysene is adoption. Unfortunately, Rysene's current foster parents are not willing to adopt him. In recent months, he has manifested a need for renewed counseling.
Dr. Joan McKelvey holds a masters degree and Ph. D. in social welfare. The respondent was referred to her by DCF in July 1998. Dr. McKelvey had seventeen sessions with the respondent and attempted to address the respondent's problems involving domestic violence. Dr. McKelvey discussed domestic violence in the home. The respondent acknowledged that such violence existed but claimed that her male partner was no longer drinking and causing a problem.
The respondent, Dr. McKelvey testified, "dropped out of treatment" with her on May 5, 1999. At that time, it was Dr. McKelvey's opinion that the respondent had not gained insight into her problems and that some of the respondent's issues were not resolvable. It was also Dr. McKelvey's opinion that the respondent could not care for her children because they had special needs that the respondent did not adequately comprehend. In a January 19, 1999 letter to DCF, she stated that the respondent "seems not to understand how important it is that [her children] be protected from the potential for domestic violence that remains with her live-in boyfriend who, I believe, continues to be involved with alcohol. Also, the emotional dynamics with her children are complicated and it appears that she is unable to understand and to appreciate the intricacies, let alone to act appropriately to work with them to allay conflict and to maximize the children's wellbeing [sic] while they are with her. Some of this inability probably comes from her own childhood, which included emotional neglect." Dr. McKelvey recommended that Rysene not be returned to the respondent if she was not in treatment and if James J. were still in the home.
Dr. Logan Green evaluated the respondent and Rysene in 1999 and 2000. He explained that the respondent's psychological profile did not change during that time. Dr. Green testified that the respondent had a narcissistic personality disorder and that it would take over a year in counseling and therapy for the respondent to recover. However, counseling and therapy would not succeed if J. were in the home. The respondent has no intention of having J. leave the home. She loves him and is dependent on him.
In his report, Dr. Green found that the respondent's abstract reasoning ability was poor. Testing reflected that her mental functioning was in CT Page 9002 the very low average range. Moreover, the respondent demonstrated no understanding of critical issues involved in child care problems and a minimal ability to choose adequate solutions in solving those problems.
Dr. Green testified that Rysene's mental abilities are in the borderline range, and he has ADHD. Rysene is being treated for that disorder and for depression. He clearly and intensely dislikes J., whom he wishes the police would remove. Dr. Green opined that the relationship between the respondent and Rysene was more of a friendship than a parent-child relationship. It is not in Rysene's best interests for him to return to the respondent's home, stated Dr. Green, nor is it in his best interests to remain in foster care until the respondent improves. Rysene's need for a permanent home, Dr. Green testified, is very strong. Although he would benefit from sibling contact, his need for permanency and stability is even stronger according to Dr. Green. Although the respondent has an important place in Rysene's life, he does not want to be with her.
Dr. Green also testified that the respondent had said that she terminated her counseling, presumably with Dr. McKelvey, because the counselor wanted to discuss a possibly terminal illness from which the respondent suffers.
Belinda Clark is the Director of the AIDS Program in Willamantic, CT. She testified on the respondent's behalf that the respondent had been her client since 1992 and that the respondent has been compliant with services. Clark also stated that the respondent was committed to the program and very involved in taking care of her medical needs. Clark also testified that the respondent was involved with her children and concerned for them. According to Clark, the respondent had completed a parenting component of the AIDS Program. Clark believed that there had been no domestic violence in the respondent's life since 1998.
Helen Scanlon was associated with the "Home Away from Home" program, which provides respite and support services for HIV positive women with AIDS. She last provided services to the respondent in late 1997 and early 1998. She testified that the respondent was very loving and supportive to her children and that the home was well kept. She also testified that the respondent was very protective of Rysene and compliant with her program.
Susan Webb, the principal of the school attended by the respondent's children, wrote letters in 1998 and 1999 stating that the respondent was very supportive of and involved with her children. According to Webb the respondent "demonstrated commitment to her children's educational needs by making sure they did their homework, arrived to school on time, and were clean, fed and ready to learn." Webb also wrote that the respondent CT Page 9003 "expects her children to rally and measure up in the basic values of respect, honesty and courtesy." A memo from Mary Ellen O'Donnell stated that the respondent was actively involved with Rysene's special educational needs.
The court now turns to the principles of law governing the termination of parental rights. "Termination of parental rights means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents. . . . Termination of parental rights is a most serious and sensitive judicial action. . . . Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to the statutory standards." (Citations omitted; internal quotation marks omitted.) In re Steven N.,57 Conn. App. 629, 632, 749 A.2d 678 (2000).
In a proceeding to terminate parental rights without a parent's consent, brought pursuant to General Statutes § 17a-112, those statutory standards require that DCF prove three elements by clear and convincing evidence: (1) that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110
or section 17a-111b that such efforts are not appropriate," (2) that one or more statutory grounds for termination exist, and (3) that termination of parental rights is in the best interests of the child. General Statutes § 17a-112 (c), now § 17a-112 (j).
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . . It is thus possible for a court to find that a statutory ground for termination of parental rights exists but that it is not in the best interests of the child to terminate the parental relationship, although removal from the custody of the parent may be justified." (Citations omitted; internal quotation marks omitted.) Inre Ashley E., 62 Conn. App. 307, 311-12, 771 A.2d 160, cert. denied,256 Conn. 910, 772 A.2d 601 (2001). CT Page 9004
 I
"It is axiomatic that in seeking to terminate parental rights, the commissioner must prove by clear and convincing evidence that the department made reasonable efforts to reunify the parent and child as required by [General Statutes] § 17a-112 (c)(1) [now §17a-12 (j)(1)]. . . . The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citations omitted; internal quotation marks omitted.) In re Daniel C., 63 Conn. App. 339, 360-61, 772 A.2d 601
(2001).
In the discharge of its statutory duty to use reasonable efforts to reunify mother and child, DCF offered the following services to the respondent: supervised visitation; referrals for domestic violence; outreach services for education and support; parenting classes and parenting training services; substance abuse evaluation and treatment; in-home reunification services with IBMT; individual counseling with Dr. McKelvey; housing assistance and financial assistance, and case management services. DCF also offered the respondent transportation to facilitate her obtaining services. In addition, DCF offered James J. substance abuse evaluation, which he refused.
By clear and convincing evidence, the court finds that DCF used reasonable efforts to reunify the respondent and her son.
 II
The sole ground on which DCF relies in its petition to terminate the respondent's parental rights as to Rysene is based on her failure to achieve sufficient personal rehabilitation. "Failure of a parent to achieve sufficient personal rehabilitation is one of six statutory grounds on which a court may terminate parental rights pursuant to §17a-112. General Statutes [(Rev. to 1999) § 17a-112 (c)(3)(B) . . . [now (j)(3)(B)]]. That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the CT Page 9005 particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) Inre Sheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001).[2] "An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities." In re Stanley D., 61 Conn. App. 224, 231, 763 A.2d 83
(2000).
"Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re DanielC., supra, 63 Conn. App. 357. However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In re Stanley D., supra, 61 Conn. App. 230.
The respondent's childhood was marred by domestic violence. Each of the five men with whom she has had children engaged in domestic violence. Her current partner, James J., has been violent in Rysene's presence on many occasions, resulting in his suffering from Post Traumatic Stress Disorder (PTSD). The respondent refuses to separate from J. She was unable to benefit from IBMT and voluntarily terminated her counseling with Dr. McKelvey for the ostensible reason that Dr. McKelvey insisted on discussing the respondent's AIDS. The respondent terminated this counseling for no good reason. She was hardly qualified or in a position to determine what was an appropriate subject to integrate into her counseling. Moreover, it is fanciful to suggest that such counseling could have been meaningful or have any possibility of success without discussing such a life-altering crisis as AIDS. Physical and mental health can both impact the ability to parent.
Even if the respondent was now to cooperate with counseling and therapy, she would be unable to rehabilitate in less than a year under the best of circumstances. However, her intellectual and other limitations to which Dr. Gibson and Dr. Green testified render it CT Page 9006 unlikely she will rehabilitate at any time in the foreseeable future. This is rendered a virtual certainty by her continued cohabitation with James J.
By clear and convincing evidence, the court finds that the respondent has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Rysene, the respondent could assume a responsible position in his life.
 III
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of . . . parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., supra, 62 Conn. App. 315. "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev. to 1999) § 17a-112 (d) [now § 17a-112 (k)]]." (Footnote omitted.) Inre Deana E., supra, 61 Conn. App. 190.
 A. (Mandatory Findings)
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion off the child with theparent.
DCF timely offered the respondent: supervised visitation; referrals for domestic violence; outreach services for education and support; parenting classes and parenting training services; substance abuse evaluation and treatment; in-home reunification services with IBMT; individual counseling with Dr. McKelvey; housing assistance and financial assistance, and case management services. DCF also offered the respondent transportation to facilitate her obtaining services.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
As found supra, DCF made reasonable efforts to reunite the family.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theCT Page 9007parent, and the extent to which all parties have fulfilled theirobligations under such order.
On July 29, 1998, the court gave the respondent the following specific steps, or expectations:
a. Keep all appointments set by or with DCF and keep your whereabouts known to DCF or your attorney. The respondent has complied with this expectation.
b. Visit the child as often as DCF permits. The respondent has complied with this expectation.
c. Participate in parenting counseling. The respondent complied with this expectation in part but was not fully candid in the counseling. Specifically, she failed to disclose to Dr. Gibson "her actual compliance with the [IBMT] program as well as she should [have]." Also, she did not benefit from the counseling provided by IBMT. The court does not find that the respondent's attending a "parenting component" of her AIDS Program satisfied this requirement. There was no elaboration of the length or content of this "component."
d. Participate in individual counseling. The respondent did not comply with this expectation. She voluntarily and without good cause terminated her counseling with Dr. McKelvey.
e. Secure and maintain adequate housing and income. There is no evidence that the respondent's income is not adequate. However, DCF claims that the respondent's housing is inadequate because James J. remains in the home. The respondent argues that this specific step does not contemplate an examination into the occupants of the housing. On the facts of this case, the court agrees with DCF.
A determination of this issue requires an interpretation of the specific steps. "Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to the statutory standards." In re MigdaliaM., 6 Conn. App. 194, 203, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986). So too it is well-settled that a provision in a contract is construed against the drafter. See, e.g., Game-A-Tron Corp.v. Gordon, 2 Conn. App. 692, 695, 483 A.2d 620 (1984).
However, the specific steps issued by the court are neither statutory standards nor contractual provisions. On the other hand, the Appellate CT Page 9008 Court has recently held that "specific steps contained in the ex parte order are not themselves orders, but rather serve as criteria by which to measure personal rehabilitation and notice of impending termination of parental rights." In re Jeffrey C., 64 Conn. App. 55, 62, ___ A.2d ___ (2001).[3] "[T]he specific steps prescribed by a court, pursuant to § 46b-129 (b), may not be interpreted as orders unto themselves from which the court may issue a contempt order." Id., 63.
Here, the specific steps were not issued at the time of an ex parte order, pursuant to General Statutes § 46b-129 (b), but as a necessary component of an adjudication and finding of neglect. The specific steps, therefore, were issued pursuant to General Statutes § 46b-129 (j) which provides: "Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the Commissioner of Children and Families. . . . The court shall order specific steps which the parent must take to facilitate the return of the child or youth to the custody of such parent." Especially since the steps were issued as a necessary part of the judgment, they should be interpreted in accordance with the rules for interpreting judgments.
"The construction of a judgment is a question of law for the court. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances's surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Citations omitted.) Fenton v. Connecticut HospitalAssn. Workers' Compensation Trust, 58 Conn. App. 45,51-52, 752 A.2d 65, cert. denied,254 Conn. 911, 759 A.2d 504 (2000); see In re Shyina B., 58 Conn. App. 159,163-64, 752 A.2d 1139 (2000) (reading portion of trial court decision in the context of the decision as a whole).
The circumstances surrounding the issuance of the specific steps involved the adjudication of Rysene as a neglected child. The summary of facts accompanying the petition of neglect related an odyssey of abuse in which the respondent had to flee to a shelter to escape J.'s abuse; that J. had "rewarded Rysene with five dollars when he learned that Rysene had choked his nine year old sister until her face was purple," an allegation the respondent admitted; that J. would go on a drinking binge and come home intoxicated and assault the respondent within the children's hearing; that J. would assault the respondent's daughters, although the respondent denied this to DCF; that the respondent had violated her agreement with DCF to keep J. out of the house; that the respondent told CT Page 9009 her children not to tell DCF when was home; that J. told the respondent that he would punch her because she was outside playing with her children instead of cleaning the house; that J. had sex with a thirteen year old child in another state; that the respondent told DCF she would rather be beat to death than return to a shelter; and that the respondent's children did not feel safe when J. is around them.
In light of these circumstances surrounding the issuance of the specific steps, the court finds that the expectation that the respondent maintain adequate housing contemplated that James J. not be in that housing. J., however, remains an inhabitant of that housing. He thereby renders that housing extremely emotionally, if not physically, dangerous to Rysene.
f. A final specific step that the court gave the respondent was not to engage in substance abuse. There is no evidence that the respondent has engaged in substance abuse since Rysene was last removed from her care.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Rysene has a warm and nurturing relationship with his foster parents. He has a conflicted and ambivalent relationship with his mother, to whom he does not wish to return.
5. Finding regarding the age of the child.
Rysene is nine years old.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
While the respondent visited Rysene when visitation has permitted, she has fundamentally refused and failed to adjust her circumstances and condition to make it in the best interest of Rysene to return to her. She is unable to appreciate how crucial it is to protect her child from CT Page 9010 domestic violence and to effectively deal with domestic violence in counseling. She exalts her needs, and those of James J. over those of Rysene by permitting, indeed endorsing, J.'s remaining in the home.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
The respondent has not been prevented from maintaining a meaningful relationship with Rysene by the unreasonable act or conduct of Rysene's father, who long ago abandoned the family, or the unreasonable act of any other person, or by her own economic circumstances.
 B.
Although in determining whether to grant a petition to terminate parental rights the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now § 17a-112
(k); In re Tyscheicka H., 61 Conn. App. 19, 26, 762 A.2d 916 (2000); neither compliance nor non-compliance with court expectations is the sole gauge of whether a parent has rehabilitated. In re Migdalia M., supra,6 Conn. App. 206; In re Passionique T., 44 Conn. Sup. 551, 564,695 A.2d 1107 (1996) (Brenneman, J.); see In re Kasheema L.,56 Conn. App. 484, 490 n. 3, 744 A.2d 441, cert. denied, 252 Conn. 945,747 A.2d 522 (2000) (parent who has obtained a job and remained drug free not necessarily rehabilitated). "The trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.)In re Alissa N., 56 Conn. App. 203, 208, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). Notably, General Statutes (Rev. 1999) § 17a-112 (i) now § 17a-112 (p), expressly provides that its provisions "shall be liberally construed in the best interests of any child for whom a petition under this section has been filed." "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re Shyina B., supra, 58 Conn. App. 167.
As Dr. Green testified, Rysene has a very strong need for permanency and stability. This is particularly so because of his limitations and ADHD. Unfortunately, his foster parents will not be adopting him. DCF is moving Rysene to a pre-adoptive home. Rysene, as observed supra, does not CT Page 9011 wish to return to his mother's home. While adoption may impair Rysene's contact with his siblings, which he enjoys and from which he benefits, it is, as Dr. Green attested, more important that Rysene find stability and permanency.
"Although subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated . . . it is not a necessary prerequisite for the termination of parental rights." (Citations omitted.) In re Eden F., 250 Conn. 674, 709,741 A.2d 873, rehearing denied, 251 Conn. 924, 742 A.2d 364 (1999). "While long-term stability is critical to a child's future health and development . . . adoption provides only one option for obtaining such stability." (Citation omitted.) Id. So too, of course, that a bond exists between parent and child does not require that a petition to terminate parental rights be denied. In re Quanitra M., 60 Conn. App. 96, 105-107,758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). Although there is no certainty that Rysene will ultimately be adopted, little benefit and some harm will probably inure to him if the respondent remains in his life. This is not a case like In re Alissa N., supra,56 Conn. App. 203, In re Shawn B., Superior Court, Child Protection Session at Middletown, No. N05-CP96-000407-A (November 2, 2000), or In reJennifer M., Superior Court, Child Protection Session at Middletown, No. N05-CP99-10689 (June 2000), in which a real benefit inured to the child and outweighed the benefit of an immediate termination of parental rights.
The court finds by clear and convincing evidence that it is in Rysene's best interests that the respondent's parental rights be terminated.
The petition is granted. The court terminates the respondent's parental rights. The Commissioner of the Department of Children and Families is appointed statutory parent for Rysene for the purpose of securing a permanent adoptive family for him. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Dated at Middletown this 9th day of July, 2001.
BY THE COURT
Bruce L. LevinJudge of the Superior Court