BRENNEMAN, J.
 

 On April 18, 1996, more than three years after first being placed in foster care at the age of seventeen months, Passionique T. became the subject
 
 *554
 
 of this petition by which the department of children and families (department) seeks to terminate the parental rights of Linda T. and Eddie L., her mother and unacknowledged putatitive father, so that she might know the security of adoption after spending more than two thirds of her life as a ward of the state of Connecticut. The mother was served personally at her home in Bridgeport and the putative father was served by publication. Neither appeared at the initial hearing on May 16,1996. The court, suo moto, appointed separate counsel for each parent and, at the continued hearing on June 6, 1996, Eddie L. appeared with counsel and remained silent to the termination petition which, as filed, alleged no grounds for terminating his parental rights. Denials for all grounds pleaded were entered on behalf of the absent mother by her attorney and the matter continued for a pretrial conference in July.
 

 Again, Linda T. failed to appear, and a trial date certain was set for September 26, 1996, with the warning that the court would proceed to judgment by default on that date if the mother again failed to appear.
 

 Linda T. appeared in court with new counsel on the assigned trial date. No motions had been filed by any party on, or prior to, that date. A document captioned “Amendment to Petition for Termination of Parental Rights,” filed one week earlier by the department without consultation with counsel, was deemed to be supplementary information to the social study rather than an amendment since no motion to amend the pleadings had previously been filed. Had such motion been made on the assigned trial day, it would had to have been denied as being untimely filed. Practice Book § 1042.1 (4).
 

 Eddie L., with the advice of counsel, executed a consent to the termination of whatever parental rights he
 
 *555
 
 might have had as a result of having been named as Passionique’s father. He had never acknowledged paternity, always questioned whether he was, indeed, her father, had never been adjudicated to be her father in any court, named on her birth certificate, lived with or supported her in any manner. The department, without objection, orally amended the petition to add a ground — consent—for terminating his parental rights and the court, finding his consent to have been made knowingly and voluntarily and with the advice of experienced counsel, accepted it as a valid ground for terminating those rights. Further, at the request of Eddie L., the court found it to be in Passionique’s best interests to end this uncertainty of paternity and, without objection by counsel for the other parties, terminated his parental rights, such as they might be, and excused him and his counsel from further proceedings.
 

 Testimony was then offered by the department from the social worker trainee assigned to the case in August, 1995, the present foster mother (a maternal cousin) and her sister, who assisted with child care. No documentary evidence was submitted by any party other than the social study mandated by General Statutes (Rev. to 1995) § 45a-117 (e) (1), incorporated by reference to petitions brought by the department on behalf of committed children pursuant to General Statutes § 17a-112, as amended by No. 95-238, § 3, of the 1995 Public Acts, effective October 1, 1995. At the end of the first trial day, all parties rested and were given until October 10, 1996, for the filing of trial memoranda.
 

 The adjudicatory date is thus April 18, 1996, when the petition was filed, lacking any valid subsequent amendment. If grounds are found to terminate Linda T.’s parental rights on facts existing on the adjudicatory date, the court may consider all facts existing to the final day of trial, September 26, 1996, for which valid
 
 *556
 
 evidence was offered on that trial date. The period of reserved decision, however, does not commence until October 10,1996, the date set for the filing of trial memoranda.
 

 Evidence offered at trial, interpreted in the light of the prior court record concerning this child, of which judicial notice is taken, supports the finding of the following facts.
 

 Passionique was bom on July 29, 1991, to her then fifteen year old mother who was living at that time with her adoptive mother, whom she characterized as an active alcoholic. The first referral received by the department on Passionique came from Bridgeport Hospital when the child was less than one month old and had been presented there with a broken femur. Although such injuries, according to child abuse literature, are extremely rare in infants, because the opinion of the hospital staff was that the break could have resulted from an accident, as the mother claimed. Therefore, the department did not seek temporary custody or otherwise initiate neglect proceedings, but rather chose to open a voluntary protective services case under the department’s general powers under General Statutes § 17a-3. After five months, the child appeared to be well cared for, and the department closed the case.
 

 Ten months later, when Passionique was sixteen months old, she was back in Bridgeport Hospital, with second degree burns on her arm and legs, which the mother again explained as having happened accidentally when the toddler had been briefly left alone in a room with a hot iron, still plugged in, left on the floor. These bums had occurred three or more days earlier, and only came to the attention of the authorities when the police were called to the home because of a violent altercation between Linda T. and her adoptive mother.
 

 
 *557
 
 On the basis of Bridgeport Hospital’s report that the injuries were inconsistent with Linda T.’s explanation as well as concern for the level of care provided to the child if the mother’s explanation could be believed, the department secured temporary custody on December 7, 1993. Although a guardian ad litem had been appointed for the sixteen year old mother prior to the initial temporary custody hearing on December 17, 1992, the matter was continued to January 6, 1993, to secure an attorney for her as well. Linda T. appeared at that continued hearing with both her attorney and guardian ad litem, and admitted that Passionique had been neglected and agreed to her commitment to the department for an initial period of eighteen months. Immediately following commitment, her placement was transferred from a foster home to the home of her maternal uncle, Richard T., and his wife, Shirley T., acting as foster parents. No expectations for reunification were articulated by the court at that time in view of Linda T.’s stated intent to join the job corps in Massachusetts, to secure her high school equivalency, and to undertake vocational training as a means of establishing a stable home to which her daughter could be returned.
 

 Linda T., in fact, did join the job corps four months after this hearing, and the plan continued to be reunification after she completed that program and established a home for herself and her child. In the study dated March 10, 1994, prepared for the first petition filed by the department pursuant to subsection (e) of General Statutes § 46b-129 to extend Passionique’s commitment beyond July 6, 1995, the plan remained the same despite the fact that nearly one year after entering the job corps, Linda T. still had another two years remaining. The department concluded its study for extension of commitment with this statement: “This department supports this placement until [Linda] T. is able to return to the community and provide Passionique . . . with stable living conditions.” The child
 
 *558
 
 was then living with Shirley T., the separated wife of the maternal uncle with whom she had been placed originally. It is significant that the treatment plan that preceded this study, prepared in January, 1994, contained the statement: “Maternal aunt is not interested in securing legal guardianship.”
 

 On the strength of this recommendation, the court, in a hearing on May 12, 1994, extended Passionique’s commitment for a second eighteen month period effective July 6, 1994. Linda T. had been served by certified mail at the job corps. The court file contains the order for such service, but no card indicating return. Linda T. did not appear at that hearing, nor did the attorney who had represented her at the time of commitment who had not been reappointed for, or notified of, this hearing.
 

 At the time of ordering the extension of commitment of this child who had then been in foster care longer than she had lived with her mother, the court ordered the department to file a treatment plan on January 6, 1995. The treatment plans presumably prepared in January and July, 1995, were never submitted to the court. The court, therefore, had no knowledge that the child had been moved from the home of Shirley T., at the latter’s request, to that of Karen M., a maternal second cousin, in November, 1994, nor that Karen M., unlike Shirley T., expressed a desire to adopt the child. This presumably explains why, in October, 1995, when the department filed its second petition to extend Passionique’s commitment beyond January 6,1996, the reason given for prolonging her foster care status was no longer in order to await Linda T.’s discharge from the job corps and return to Connecticut but, rather, for a different permanency plan: “A permanent plan is also needed for her care. She has not lived with her natural mother for nearly three years.” When notice to Linda T. of an extension hearing on November 15, 1995, was
 
 *559
 
 returned from the job corps as undeliverable, service by publication in Connecticut was ordered for a continued hearing on December 28, 1995. By this time, the social worker had confirmed from the job corps that Linda T. had been discharged from the program for excessive absences. The social worker was able, however, to give Linda T. the time and date for the continued extension hearing during a telephone call Linda T. initiated, but she neither appeared nor was counsel reappointed to represent her in the absence of her request for court-appointed counsel. On December 28, 1995, the court again extended Passionique’s commitment, this time for a period of twelve months from January 6,1996. The court further found, at the request of the department pursuant to No. 95-238, §§ 2 (b) and 4 (e) of the 1995 Public Acts, that continued efforts to reunify Passionique with her family were not appropriate. Also, pursuant to that recent enactment, the department was ordered to file a termination petition no later than sixty days thereafter, or February 22, 1996: “At such hearing the court shall determine the appropriateness of continued efforts to reunify the child or youth with his family. If the court finds that such efforts are not appropriate, the department of children and families shall within sixty days of such finding either (A) file a petition for the termination of parental rights, (B) file a motion to revoke the commitment and vest the custody and guardianship of the child on a permanent or long-term basis in an appropriate individual or couple or (C) file a written permanency plan with the court for permanent or long-term foster care, which plan shall include an explanation of the reason that neither termination of parental rights nor custody and guardianship is appropriate for the child. The court shall promptly convene a hearing for the purpose of reviewing such written plan.” Public Act 95-238, § 4 (e). Although the department was again in violation of a clear order of the court,
 
 *560
 
 no contempt proceeding was initiated in response to such failure.
 

 This petition was, in fact, filed more than two months late, and more than three months after another treatment plan had been prepared on January 4, 1996. By this time, the department knew that Linda T. had been discharged from the job corps and that she had returned to Connecticut, but had neither informed the department of her whereabouts nor requested visits with Passionique as she had been informed, in late 1995, she must do in order to see her daughter. In that treatment plan, which was not submitted to this court until June 6, 1996, during the pendency of this action, a new permanency plan was announced for the first time: to seek termination and adoption by Karen M. According to the social worker, reunification plans could not be made since Linda T.’s whereabouts were unknown. She had failed to appear in court on December 28,1995, despite being informed by the social worker of that extension hearing, and she had failed to request visitation until after initiation of this action.
 

 Karen M. testified that for the first year Passionique lived with her (November, 1994 to late 1995) Linda T. was free to visit at will; she spent the night in Karen M.’s home in January, 1995, stayed there again and was permitted to babysit Passionique for five days in 1995 at the time of the death of the maternal grandfather, and again for a shorter period in October, 1995. Because Karen M. was permitted to take the child out-of-state for the summers, no visits were possible during the three month school holidays in 1995 and 1996. In late 1995, after threats made by Linda T. and her sister against Karen M. were communicated to Karen M. by the maternal uncle, who was then living with Karen M., Linda T. was told that all visits thereafter had to be arranged through the department.
 

 
 *561
 
 Karen M.’s sister, Lisa, who babysat every day while Karen M. worked, testified that Linda T. came over about five times between January, 1995, and June, 1995, but only at night after Passionique was asleep.
 

 After Linda T. was dismissed from the job corps and returned to Connecticut, she did not contact the department; the social worker learned from others of her discharge and confirmed it by calling the job corps in Massachusetts. No written report as to her progress during the more than two years spent in that program was made available to the department or to the court since Linda T. neither executed a release for this purpose nor introduced it into evidence on her own behalf.
 

 No services were offered to Linda T. by the department during the years she was reported to be in the job corps since she was not in Connecticut to receive such services and, presumably, the job corps was providing her with the education, the counseling and the vocational training necessary for her to establish a stable life for herself and her daughter. When she returned from the job corps after more than two years without having earned her high school equivalency, she was again pregnant and living with her adoptive mother, but no services could be offered since she failed to inform the department of these circumstances until after initiation of this action. A social worker testified that during one telephone call initiated by Linda T. after her return to the state, she did give an address but mail sent to her there was returned. The social worker also testified that she informed Linda T. during another call of the extension hearing on December 28, 1995, which Linda T. failed to attend. Lacking a current address, the treatment plan of January, 1996, which, for the first time, announced an intent to seek termination and adoption by Karen M., could not be mailed to Linda T., who heard from Karen M. that the department planned to seek termination of her parental rights. Linda T. telephoned
 
 *562
 
 the social worker on January 7, 1996, to ask why, but in the midst of her explanation of the reasons, Linda T. hung up. She telephoned again on March 19, 1996, with the same inquiry, and when told that she should inform the department of her current address she asked, “Why?” and was instructed to call her court-appointed attorney. At that point, however, there was no court-appointed attorney for Linda T. When she asked for a visit, she was told to call back after the social worker could arrange for a supervised visit to take place with the assistance of a case aide. Linda T., however, did not call back until six weeks later and then only to ask about an impending court date, not to request a visit.
 

 It was only later that the department learned that, at the time of her discharge from the job corps, Linda T. was again pregnant. She delivered her second child out of wedlock and of unrevealed paternity, in the summer of 1996, while again living with her adoptive mother whose earlier behavior while intoxicated had led to the police involvement resulting in Passionique’s original placement two and one-half years earlier.
 

 At the time of testifying on her own behalf, Linda T. was still living with her adoptive mother and caring for her second child, then three months old, in a matter satisfactory to the department. The agency had opened a protective case (with a different social worker) because of the past neglect of her first child, and apparently found no fault with her care of this child since no proceedings had been initiated to remove her. No testimony, however, was offered by anyone other than Linda T. as to this satisfactory level of child care.
 

 Having failed to achieve her high school equivalency in her more than two years with the job corps, she now claimed to be studying for her G.E.D. and, after passing it in December, planned to enter training to become a
 
 *563
 
 nurse. She knew she was supposed to call the department to request visits. The only excuse she gave for not having done so was because her social worker was “no good.” When she finally requested a visit after Passionique returned from her summer out-of-state, she was promptly accorded one in early September. While testifying that she felt able now to provide a home for Passionique, she was indefinite as to when she would have a home of her own, rather than her adoptive mother’s, to which to bring the child. While there was conflicting testimony about the number of visits paid after she joined the job corps in May, 1993, and the number of times she had sent presents to her daughter or conducted telephone calls with her, Linda T. admitted that she had never requested Passionique’s return to her care during the nearly four years of the child’s commitment to the state, and that she had never contacted the department as to any matter during all of 1993 and 1994 — when the assigned social work was
 
 not
 
 hostile to her. She acknowledged being told to keep the department informed of her whereabouts at all times, and gave as her only reason for not having done so her feeling that the newly assigned social worker was antagonistic to her. Asked how many times she had tried to see Passionique in all of 1995, she responded, “A few times,” and “[m]aybe twice in 1996.” She knew the name of the attorney who had represented her in the commitment healing in January, 1993, but gave no reason why she had made no attempt to contact him in the more than three years that followed, even after learning of the department’s plan to seek termination of her parental rights and after being instructed by the social worker in the telephone call of January, 1996, to do so. Linda T. offered no evidence to support her self-serving testimony as to her present career goals, care of her new baby, or any remission of her adoptive mother’s alcohol problems. She did not offer any report from the job
 
 *564
 
 corps as to the extent of her cooperation with the program during the more than two years she had lived in Massachusetts. She offered no explanation of her failure to attend the extension hearing on December 28, 1995, at which her expressed intention of regaining Passionique’s custody might well have resulted in the articulation of court expectations, the securing of evaluations of the child’s emotional ties with her mother and others, and the direction for the department to involve her in specific services calculated to result in reunification.
 

 The department pleaded, as to Linda T., all four of the nonconsensual grounds for terminating the parental rights of parents of committed children. Three of these must fail.
 

 I
 

 ABANDONMENT
 

 Abandonment as grounds for termination of parental rights does not require the total and intentional cessation of all contact with a child necessary for abandonment at common law, but rather only the failure “to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . .” General Statutes § 17a-112 (c) (3) (B). The amount of contact between mother and daughter during Linda T.’s period in the job corps in Massachusetts was apparently satisfactory to the department according to the treatment plans submitted during 1993 and 1994. The permanency plan for Passionique prior to October, 1995, is not known since treatment plans were not submitted to the court at the time, or into evidence by any party during trial. Evidence as to the frequency of visits, either during that period or subsequent to her return to the state, was too vague and contradictory for a finding to be made on the clear and convincing standard of proof required. The department apparently never asked Karen
 
 *565
 
 M. to keep a written log of such visits, and Karen M.’s memory, as well as that of her sister, was not sufficiently clear to draw a firm conclusion. No written service agreement or list of court expectations was ever spelled out for Linda T. so that she could know in advance of the minimum contact expected of her to avoid a finding of abandonment. This lack of clarity makes it impossible for the court to find by clear and convincing evidence that Linda T. abandoned Passionique, even in the statutory sense applicable here. This ground is, therefore, dismissed.
 

 II
 

 ACTS OF COMMISSION AND OMISSION
 

 The department offered no evidence that Passionique has been denied any care, guidance or control necessary for her physical, educational, moral, or emotional well-being since she was removed from Linda T.’s custody in December, 1992. Even if the child had been so denied, unless such deprivation occurred during visits with her mother, the responsibility for such denial would be that of her legal guardian, the department, and not of her parents. This ground is, therefore, also dismissed.
 

 III
 

 NO ONGOING PARENT-CHILD RELATIONSHIP
 

 Evidence offered by the department itself precludes a finding that this ground exists under the interpretation given to it by
 
 In re Jessica
 
 M., 217 Conn. 459, 586 A.2d 597 (1991). The child clearly knows that Linda T. is her mommy — or one of her mommies— and has no aversion or documented negative reaction to her visits. Even if Karen M. is identified as her principal mother after eighteen months of being her primary caretaker, the fact that this is a natural result when custody is removed from a biological parent by action of the department is a bar to using this fact to establish a ground for
 
 *566
 
 termination. See
 
 In re Valerie D.,
 
 223 Conn. 492, 613 A.2d 748 (1992);
 
 In re Kelly S.,
 
 29 Conn. App. 600, 616 A.2d 1161 (1992). This ground must, under this authority, also be dismissed.
 

 The department has, however, established by the requisite clear and convincing proof that a remaining ground existed as of the adjudicatory date: “[T]he parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .” General Statutes § 17a-112 (c) (3) (B). Whether expectations were ever spelled out by a court, or the parent ever attended treatment plan reviews, the simple gauge for the existence of this ground is the answer to the question: Is the parent, on the adjudicatory date, any closer to being able to provide satisfactorily for the neglected child than she was on the date the child’s custody was removed? April, 1996, found Linda T., having failed to complete the job corps program despite being readmitted after her first discharge, back in Connecticut, about to give birth to a second child out of wedlock, with only her adoptive mother, with a known history of alcoholism, as her family support. She had not completed her education, had no employment or prospects for any, no home of her own and no consistent record of visitation suggestive of any strong motivation to resume parenting Passionique in the foreseeable future. Expecting a second child and being a high school dropout at the age of twenty, in fact, makes the prediction, that within a reasonable time she could resume Passionique’s custody, even more remote than at the time of original commitment when she was a sixteen year old high school dropout with only one child and a plan
 
 *567
 
 to take advantage of the opportunities afforded by the job corps. Linda T. offered no more evidence to support her prediction that she would secure her G.E.D. and enter training to become a nurse in December, 1996, than would have supported the prediction in January, 1993, that she would secure her G.E.D. and regain Passionique’s custody within two years. She had accomplished nothing between the date of commitment and the adjudicatory date that would encourage the belief that, within a reasonable time, considering the age and needs of the child, she would be able to become this child’s primary caretaker.
 

 Had this action been brought one year earlier, an order of termination might lie as being in Passionique’s best interests despite the fact that Linda T.’s lack of diligence in seeking reunification with Passionique was matched by that of the department in facilitating such reunification. Prior to the effective date of Public Act 95-238, whether the department made reasonable efforts to reunite the family was but one of seven considerations on which the court was required to make written findings prior to ordering termination in a nonconsensual case. General Statutes (Rev. to 1995) § 17a-112 (d). Public Act 95-238, however, which purported to facilitate termination of parental rights in appropriate cases, actually made it
 
 more
 
 difficult in cases like the present one. Prior to October 1, 1995, a finding that the department had not made reasonable efforts to reunite the family could not defeat an order of termination determined to be in the child’s best interests, but, rather, would constitute a failure to fulfill an obligation under the federal Adoption Assistance and Child Welfare Act of 1980; 42 U.S.C. § 670 et seq.; as amended, and, therefore, might jeopardize the state’s expectation of partial reimbursement for foster care expenses as provided by that act. Effective October 1, 1995, six months before this termination petition was filed, a finding that the
 
 *568
 
 state had failed to make such reasonable efforts would not only jeopardize federal foster care reimbursement, but also acted as a bar to ordering termination — even if found to be in a child’s best interests — since
 
 such efforts were made a condition precedent to any order of termination.
 
 Public Acts 1995, No. 95-238, § 3 (b), later codified as § 17a-112 (c) provides in relevant part: “The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds that the department of children and families has made reasonable efforts to reunify the child with the parent and, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year: [one or more nonconsensual grounds exists] . . . the requirement that the department of children and families has made reasonable efforts to reunify the child with the parent shall not apply to terminations of parental rights . . . where such reasonable efforts at reunification were not possible .. . .”
 

 During Linda T.’s period in the job corps, reunification efforts were not possible other than to permit open visitation at the homes of relatives with whom Passionique was placed. Even after visitation at Karen M.’s house stopped at Karen M.’s request, visitation was still permitted but had to be requested in advance by Linda T. The department learned, however, just two weeks after Linda T.’s discharge from the job corps in November, 1995, that she had been terminated from that program and was back in Connecticut. While it is undeniable that Linda T. was remiss in failing to inform the department that her whereabouts changed from time to time, it is equally clear that the department made no efforts to find her. The department made no
 
 *569
 
 inquiry of Karen M. or Lisa, Richard T. or his ex-wife, Shirley T.; it did not seek to find Linda T.’s adoptive mother, with whom she was then living; it did not request the court to appoint Linda T.’s original attorney for the purpose of attempting to locate her; it did not ask Karen M. to transmit messages if Linda T. contacted her or to keep a written log of any visits or calls, which would have been admissible evidence in a termination trial.
 
 In re Barbara J.,
 
 215 Conn. 31, 42, 574 A.2d 203 (1990). Having represented to the court on December 28,1995, that Linda T. was back in Connecticut, whereabouts unknown, and not seeking visitation with Passionique, the court acceded to the request of the department to find that further efforts to reunify were not appropriate. The department interpreted such a finding as relieving them of
 
 any
 
 effort to facilitate the relationship between parent and child. It is noteworthy that soon after the appointment of new counsel for the mother, her whereabouts were promptly ascertained and she appeared to contest fully termination of her parental rights at the trial.
 

 Linda T. was reasonably lulled by treatment plans filed in 1993 and 1994, which she presumably received in Massachusetts, into believing that so long as she was in the job corps, no move would be made to make any permanent plan other than returning Passionique to her care. The October, 1995 treatment plan, however, abruptly changed that, not because Linda T. had failed to complete the job corps or to communicate her whereabouts in Connecticut, since such failure and subsequent return to this state had not occurred by October, but rather because the new November, 1994 foster mother, unlike the previous one, had expressed a desire to adopt the child. This change of circumstance, unrelated to Linda T.’s rehabilitation or lack thereof, appears to be the sole basis for the change in the long-term plan from reunification to termination and adoption.
 

 
 *570
 
 It is undeniable that reasonable efforts to reunify parent and child are not possible where the parent’s whereabouts is unknown. Where, however, the department has made no apparent effort to find a parent who has so many relatives in close proximity and who had had, at the time of commitment, a court-appointed attorney, a finding that reasonable efforts have been made, even by a preponderance of the evidence, cannot be made. The court notes that as of October 1, 1996, such finding, as condition precedent to termination, will have to be made by the even higher standard of clear and convincing evidence, thus imposing an even higher hurdle to the freeing of committed children for adoption through nonconsensual termination of parental rights. Public Acts 1996, No. 96-246, § 18 (c).
 

 Since one of the three conditions precedent to any order of termination of parental rights, inserted in the statute by Public Act 95-238, was not met in the present case, the petition must be dismissed. Such dismissal, however, is without prejudice in the sense that, following a reasonable period during which reasonable efforts to reunify Linda T. and Passionique will be made, if such efforts should prove fruitless, the department may initiate another termination petition based not only upon such subsequent failure to rehabilitate, but also upon the facts that support the finding herein that this ground existed as of April 18, 1996.
 

 To ensure that four more years do not pass without securing a permanent home for this little girl, it is ordered that the court services officer schedule an immediate case conference for the purpose of setting forth written expectations of both Linda T. and the department and, subsequently, a review in court for the purpose of placing on the court record those expectations and the approximate time frames for achieving them. It is further ordered that a children-in-placement volunteer guardian ad litem be appointed forthwith, to
 
 *571
 
 participate in such case conference and all subsequent meetings and hearings thereafter for the purpose of preventing the kind of empty record that was presented to the court by both the department and Linda T. in the present case.
 

 Since Passionique remains a committed child, it is further ordered that the department file at once the petition for extension of commitment that was due, pursuant to § 46b-129 (c), no later than October 6,1996. Failure to so file before November 11, 1996, will result in the institution of contempt proceedings. It is further ordered that the appointments of counsel representing both the child and the mother in the termination trial be continued, if such counsel are willing to serve in their respective capacities, for so long as the child remains committed to the care and custody of the department.