[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Department of Children and Families (DCF) has filed a petition to terminate the parental rights of the respondent Carrie B. with respect to her son, Shawn B. The petition is based on the respondent's having failed to achieve sufficient personal rehabilitation following Shawn's having been adjudicated "uncared for."
 I Adjudication
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence."In re John G., 56 Conn. App. 12, 17, 740 A.2d 496 (1999). "In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment."In re Kasheema L., 56 Conn. App. 484, 487, 744 A.2d 441, cert. denied,252 Conn. 945, ___ A.2d ___ (2000); id., 490; see Practice Book §33-3(a). With this principle in mind, the court finds the following facts with respect to adjudication.
The respondent was born in New Haven on March 16, 1979, the only child of her parents' marital union, a marriage that was marked by domestic violence. Her parents divorced in 1982 when she was three years old. Her mother became involved with an emotionally disturbed drug addict who, the respondent sometimes alleged, molested her as a child.[1] The respondent also witnessed her mother preparing drugs for illicit use. The CT Page 13504 respondent's behavior became extremely out of control and aggressive. She was placed on homebound scholastic instruction until her teacher resigned. No facility would accept her for day treatment because of her behavior and her mother refused to accept residential services. DCF filed petitions alleging neglect. The respondent's mother then placed her with a maternal relative. This placement was a failure because of the respondent's oppositional behavior.
The respondent was placed in foster care in October, 1986 when she was nine years of age. There followed nine other placements, including residential treatment in Highland Heights and Children's Center, hospitalization at Elmcrest and other foster placements. Over the years, the respondent expressed great anger at DCF for what she viewed as ruining her life.
DCF' filed a petition to terminate the respondent's parents' parental rights to free the respondent for adoption. The petition was granted on July 23, 1990. Unfortunately, her mother appealed that decision. Although the appeal was unsuccessful, when the respondent was finally available for adoption she was no longer receptive to it.
Following a series of foster home placements, during which she visited with her mother and maternal relatives, the respondent became aggressively out of control and was hospitalized at Elmcrest in October, 1994. She was diagnosed with major depression, oppositional defiant disorder, post traumatic stress disorder and borderline personality traits. Recommendations were made for residential treatment. In January, 1993, she was admitted to Children's Center.
In March, 1995, the respondent ran away from Children's Center and stayed at the home of the respondent father, Harold G. The respondent became pregnant by the respondent father. The pregnancy was unplanned. Harold abandoned her[2] and the respondent moved in with her mother. However, she was unable to cope with her mother's drug addiction. In October, 1995, after an incident in which she threw stones at her mother, the respondent asked for placement. She was accepted at St. Agnes Home. There, she physically attacked her roommate and was arrested. She was then placed at Life Haven Shelter. On January 11, 1996, the respondent gave birth to Shawn B. The respondent was sixteen years of age.
In 1996, Mrs. Trudy Craig befriended the respondent at church. In February, 1996, the respondent accepted the Craig's invitation to live with her son at their home.
On July 3, 1996, DCF filed a petition seeking an adjudication that CT Page 13505 Shawn was "uncared for." "The term `cared for' is defined in General Statutes § 46b-120 as follows: `a child or youth may be found "uncared for" who is homeless or whose home cannot provide the specialized care which his physical, emotional or mental condition requires.'" In re Carl O., 10 Conn. App. 428, 435, 523 A.2d 1339 (1987). DCF's petition alleged that Shawn was uncared for because the respondent was seventeen years old and herself committed to DCF; the respondent was not eligible for federal aid to families with dependent children (AFDC);42 U.S.C. § 601 et seq.; and Shawn's father was only seventeen, attended a day treatment program, was unemployed and not a resource for Shawn.
On August 2, 1996, the respondent executed a voluntary plea of nolo contendere to the petition and, on that date, Shawn was adjudicated as uncared for and committed to the care and custody of DCF. He was voluntarily placed with the Craigs, where the respondent also resided. The Craigs became licensed by DCF as a special study foster home. DCF's plan was to reunite the respondent and Shawn as a mother-child unit. At the time of the adjudication, the court entered the following orders, or "expectations," directed to the respondent: (1) keep all appointments set by or with DCF, and keep you whereabouts known to DCF and your attorney; (2) continue education or secure part-time employment; (3) sign releases as requested; (4) continue to reside in identified foster home.
The respondent complied with each of these expectations. She continued to reside with the Craigs, together with Shawn. She acquired a G.E.D. high school diploma in 1996, completed a course in driver's education and obtained her driver's license. The respondent also enrolled in Gateway Community College. She did reasonably well in her first year, in 1997, assisted by a tutor.[3] She did not do well in her second year and school became difficult and stressful for her. She was in counseling, going to school, working part-time and living with the Craigs. She terminated her studies at Gateway.
In February, 1998, the respondent's DCF social worker observed that her behavior vacillated from responsible to adolescent or even pre-adolescent. On March 19, 1998, the same social worker visited the Craig's home and observed that the respondent had difficulty supervising, disciplining and coping with Shawn, who was a very active child. The respondent's primary focus was not on parenting Shawn. Also, at this time, the respondent was not meeting her responsibilities in the Craig's home and was not abiding by the rules of the home.
In the Spring of 1998, the respondent, who was then 19 years of age, expressed a desire for independent living with her son. This was not a viable alternative unless the respondent received necessary services. CT Page 13506 Because the respondent was no longer attending school, she was not eligible for DCF services unless she was employed.
On April 6, 1998, the respondent's social worker prepared a referral to the Community Housing Assistance Program (CHAP), an independent entity funded by DCF. DCF's referral form stated that the reason for the placement was that the respondent "needs to master independent living skills" and "no other placement [was] available." Under "Areas of Strength" the social worker wrote: "Carrie is very verbal about her needs and is a good advocate for herself. She loves her son and knows how to access community services." Under "Areas of Additional Needs," however, the social worker wrote: "Carrie needs to improve her overall parenting skills and be able to set appropriate limits and expectations for her son. She also needs to be able to care for herself along with budgeting her time and money before taking on the full time responsibility of her son."
The respondent and her social worker looked for an appropriate apartment for the respondent and her child. The respondent found such an apartment on English Street in New Haven.
On April 23, 1998, the respondent entered into an Initial CHAP Contract. The contract enumerated the respondent's responsibilities which were (1) to reside at 137 English St., New Haven and to notify the social worker within 72 hours of a change of address, (2) to attend the Job Corps on March 16, (3) to apply for financial aid in a timely fashion (with assistance), (4) to attend school/training program full time, (5) to remain in good academic standing each semester, (6) to attend school/training program regularly and continuously, (7) to submit each semester's marks to her social worker as soon as they are posted (8) to work at T. Rex Pizza for ten to fifteen hours per week, maintaining a part-time job or other activity approved by the social worker, to discuss any changes in employment status with the social worker, and to submit pay stubs to the social worker monthly, and (9) repay DCF $36 monthly, for eighteen months, for start-up costs. In addition to her salary from her employment, the respondent was given $371.50 per month by DCF. The contract further required that the respondent save 20% of her earned income, meet with the social worker twice a month and participate in CHAP group meetings, parenting classes, and counseling. The contract warned the respondent that: "Failure to follow the terms set forth in this agreement may result in termination [sic] the CHAP." The respondent was unhappy with these conditions.
Prior to being enrolled in the CHAP program, the respondent was provided with and completed a life skills class, to help her live independently. DCF also arranged for the Yale Child Study Center to CT Page 13507 provide intensive family preservation services to the respondent so that she could be a responsible parent to Shawn. During this time the respondent was prescribed medication for depression, which had been diagnosed in 1994.
On July 1, 1998, the respondent moved into the English Street apartment with Shawn. On July 15, 1998, in furtherance of this plan, the court modified the order of disposition from commitment to protective supervision. DCF also engaged the Intensive Family Preservation Program.
The respondent's performance in the CHAP program was an unqualified failure. She failed to cooperate with the services provided to her. She maintained her employment only about two weeks and her apartment was thoroughly unkempt and filthy. She allowed garbage to accumulate; clothes were strewn everywhere and were piled up throughout the floor area. She also had difficulty refusing friends' requests for money. The respondent did not provide structure for Shawn, who began having tantrums, and was eating and sleeping at all hours. Nonetheless, he was healthy and developing well. The respondent's chronic passivity was reflected in her inability or unwillingness to discipline Shawn. The respondent was misusing the money allotted her by CHAP. She also began using marijuana and cocaine and became dependent on these drugs.
As a result of these defalcations, the respondent was terminated from the CHAP program. She voluntarily placed Shawn back with the Craigs. By this time, Shawn had lived with his mother for 2 1/2 years. However, while living at the English Street apartment, he had become an agitated, hyperactive and disobedient child. He did not want to be alone and manifested a preoccupation with cleaning the home. The respondent visited with Shawn regularly after his return to the Craigs.
The respondent moved into an apartment in West Haven. She visited her son regularly. On September 16, 1998, the court modified the disposition from protective supervision back to a commitment to DCF. Pursuant to General Statutes § 46b-129 (j), the court also ordered specific steps that the respondent was required to take to facilitate the return of Shawn to her.[4] The respondent was given another opportunity with the CHAP program but refused to follow the program's rules and was terminated from it.
DCF referred the respondent to an out-patient treatment program at the Hospital of St. Raphael for drug abuse. The respondent's attendance was consistent and she completed the program successfully, although she voluntarily reported two relapses prior to her discharge. Thereafter, she attended a relapse prevention program for a short period. After relapses in early 1999, during which she used marijuana on weekends, she resumed CT Page 13508 substance abuse treatment in a "relapse group" at Family Counseling. She has not used drugs since March, 1999.
For a brief time thereafter, the respondent lived with her biological mother whose own parental rights had been terminated. The respondent's biological mother is drug addicted.
The respondent was accepted by the Job Corps program where she began vocational training in culinary arts in November, 1998. She entered the Job Corps residential program in early July, 1999. She did well in the Job Corps and eventually graduated. She was unable to find work in the culinary field, however, because of her slowness of movement.
The respondent, whose relationship with DCF had become more strained over time, no longer wanted DCF's services and was discharged by DCF on March 31, 1999 at age 19. Because the respondent's motor vehicle operator's license was suspended, DCF determined in April, 1999 that her visits with Shawn would thereafter be supervised.
In mid-1999, the respondent again became pregnant. This pregnancy, too, was unplanned. The respondent's supervised visits with Shawn preceding the filing of the termination of parental rights petition on August 31, 1999 went well, although the respondent was inconsistent in setting limits for and disciplining Shawn.
Dr. Logan Green, a clinical psychologist, performed the court-ordered evaluation of the respondent. Dr. Green found that the respondent suffered from paranoia, depression, and below average intellectual ability. Specifically, Dr. Green found that the respondent had a "Full Scale IQ of 83, low average. Her Verbal IQ is 82 and her Performance IQ is 86. These are all low average. She exhibited particularly poor work in her knowledge of general culture, concentration, verbal reorganization ability, attention span, and attention to detail. She demonstrated a relatively good level of common sense and judgment of practical situations." Dr. Green's testing of the respondent revealed that she demonstrated a low average level of understanding of critical child care issues, but "did a much better job in picking Adequate Solutions."
Based on his testing of the respondent, Dr. Green found that, without treatment, the respondent was "more likely . . . to engage in abusive behaviors toward a child." How much more likely, however, was not adequately quantified. Dr. Green opined that the respondent "has rigid attitudes towards the appearance and behavior of children. Associated with these is the concept that children need strict rules." Other evidence, however, reflects that the respondent has difficulty setting and enforcing limits for Shawn. CT Page 13509
Dr. Green further opined that the respondent was "likely to be easily upset, frustrated or distressed. She is also likely to be careless and distrusting. She has poor self-directedness, tending to be immature and blaming. There are strong indications that she feels insecure and ineffective." The respondent's immaturity was intermittently evident during her appearance in court.[5] She also has compulsive tendencies, according to Dr. Green, feels inadequate and needs stability. In conclusion, Dr. Green opined that the respondent had "poor impulse control, low self-esteem, depression, poor ability to cope with stress, inadequate problem solving skills and unrealistic expectations of a child." The respondent's depression and personality disorders, according to Dr. Green, were amenable to treatment, although there was no evidence as to the probable length of necessary treatment nor that the respondent's low average intellectual functioning was amenable to treatment.[6]
In his testimony before the court, Dr. Green further opined that his diagnoses for the respondent were dysthymic disorder; alcohol dependence, early full remission; and dependent personality disorder with paranoid and narcissistic personality features. The court, however, heard little evidence that alcohol played a prominent role in the respondent's life.
 II
The petition to terminate parental rights is based on the respondent's having failed to achieve sufficient personal rehabilitation. "Pursuant to General Statutes [§ 17a-112 (c)(3)(B)], a trial court may terminate parental rights when the parent has `failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [the parent] could assume a responsible position in the life of the child . . . In reJohn G., supra, 56 Conn. App. 17. The statute does not "define the degree of personal rehabilitation required or the meaning of a `responsible position in the life of the child.' `A responsible position' is not necessarily the same thing as a full time caretaker." In re Migdalia M.,6 Conn. App. 194, 206, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986). Here, as in In re Migdalia M., "[t]he mother was not a full time caretaker even prior to the termination of her parental rights . . . [and the] statute does not require that a parent must either assume a full time responsibility for a child's care, or suffer a termination of parental rights." Id. "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it CT Page 13510 relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.' `. . . Rehabilitate' means `to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." In re Eden F., 250 Conn. 674, 706, 741 A.2d 873
(1999).
"According to some legal scholars, there are only three categories of the degrees of proof. They are (1) the fact in issue probably has happened; (2) it is highly probable that the fact in issue has happened; and (3) the fact in issue has most certainly happened. . . . There are three measures of persuasion: proof by a preponderance of the evidence; proof by the stricter standard such as `clear and convincing'; and proof beyond a reasonable doubt. . . ." (Internal citations omitted.) Clark v.Drska, 1 Conn. App. 481, 487, 473 A.2d 325 (1984). "The standard of clear and convincing proof used in this case denotes a degree of belief that lies between the belief that is required to find the truth or existence of the issuable fact in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution." (Internal quotation marks omitted.) In re Juvenile Appeal (85-2), 3 Conn. App. 184, 193,485 A.2d 1362 (1985). "It is not only a question of the quality of the evidence . . . but also that of the quantity of such evidence." In reEden F., 48 Conn. App. 290, 320, 710 A.2d 771 (1998). At the adjudicatory phase of the termination hearing, the ultimate issue is whether the respondent is better able to assume the responsibilities of parenting at the time of the filing of the termination petition than she had been at the time of the earlier uncared for adjudication. In re Hector L.,53 Conn. App. 359, 367, 730 A.2d 106 (1999).
The respondent was no more able to assume a responsible position in her son's life at the time of the filing of the termination petition than she was at the time of the adjudication of him as uncared for. Although the respondent achieved a degree of personal rehabilitation between the time of that earlier adjudication and the first half of 1998, the undeniable fact is that throughout the balance of 1998 until the filing of this petition on August 31, 1999, those gains were dashed. The respondent's attempt at independent living with her child was a failure to such an extent that the safety and overall welfare of her child were endangered. CT Page 13511 The respondent's personal rehabilitation was complicated by her involvement with drugs and a second unplanned and irresponsible pregnancy. While, commendably, she was able to place her addiction in remission, it cannot be said that this left her better able to assume a responsible position in Shawn's life in August, 1999 than she was in August, 1996.
This is so notwithstanding that DCF made reasonable efforts both before, during and after the respondent's aborted 1998 experiment in independent living to reunite mother and son. DCF timely provided or offered the respondent: case management services, including transportation for visitation with Shawn, and referrals to community service providers and school assistance through Gateway Community College; substance abuse services through the Hospital of St. Raphael and, later, Family Counseling of Greater New Haven; intensive family preservation through the Yale Child Study Center; individual counseling through the Family Counseling of Greater New Haven; independent living skills through the CHAP program; a cost free apartment along with all necessary housekeeping equipment, supplies and furnishings; job skill training through Job Corp.
Although the respondent is now critical of DCF's having facilitated her experiment in independent living, the reality is that it was the respondent, more than DCF, who wanted to live independently with her son. Moreover, it was reasonable for DCF to infer that the respondent would have left the Craig's home to live independently with or without DCF's services.
It must be conceded that the respondent complied with most of the expectations articulated by the court in October, 1998 when it modified the disposition from protective supervision to a commitment. Notably, the respondent did not comply with the expectation that she participate individual counseling and "[a]ccept and cooperate with in-home support services referred by DCF . . ." However, neither compliance nor non-compliance with court expectations is the sole gauge of whether a parent has rehabilitated. In re Migdalia M., supra, 6 Conn. App. 206; Inre Passionique T., 44 Conn. Sup. 551, 564, 695 A.2d 1107 (1996) (Brenneman, J.); see In re Kasheema L., supra, 56 Conn. App. 490 n. 3 (parent who has obtained a job and remained drug free not necessarily rehabilitated). "[T]he simple gauge for the existence of this ground [rehabilitation] is the answer to the question: Is the parent, on the adjudicatory date, any closer to being able to provide satisfactorily for the neglected child than she was on the date the child's custody was removed?" In re Passionique, supra, 44 Conn. App. 564.
The respondent's good performance in the Job Corps is a factor that CT Page 13512 certainly weighs in her favor, as does her consistently visiting with Shawn. But what makes the difference here, together with the failure of the respondent's experiment with independent living; see In re DanuaelD., 51 Conn. App. 829, 841, 724 A.2d 546 (1999) (minimal progress in developing independent living skills, noted); and her inability to cooperate with DCF; cf. In re Christina V., 38 Conn. App. 214, 224,660 A.2d 863 (1995); fueled by her paranoia, are her overarching psychological issues — her poor impulse control, depression, poor ability to cope with stress, inadequate problem solving skills, overall immaturity and "very low average" level of intelligence. See In reJessica S., 51 Conn. App. 667, 673, 723 A.2d 356 (1999). While, as Dr. Green observed, "both the depression and personality disorders are amenable to treatment," it cannot be said that, as of the adjudicatory date, such treatment was in the offing or that it would, within any reasonable time, enable the respondent to assume a responsible position in Shawn's life.
Much of what the court said in In re Danuael D., supra,51 Conn. App. 841-42, applies here: "The record, therefore, demonstrates that the respondent has made minimal progress in developing her own independent living skills or in her ability to care for [her] child. . . . We recognize that some of the facts relied on by the trial court . . . cannot be attributed to the respondent's lack of moral responsibility or commitment. Under [§ 17a-112], however, the trial court's obligation is not to make an unguided investigation of the respondent's fault in determining whether to grant a petition to terminate parental rights, any more than its disposition is intended to reflect some kind of moral judgment respecting a parent whose rights are terminated. Nor may this court invalidate the statutory criteria of [§ 17a-112] merely because that criteria may in some instances implement the legislature's judgment that parental rights should be terminated despite the fact that a particular parent, with the best intentions, personally may be incapable of overcoming deficiencies in parenting skills."
For the foregoing reasons, the court finds that DCF has proven by clear and convincing evidence that the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her son Shawn, she could assume a responsible position in the life of the child.
 III
"If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether the termination of parental CT Page 13513 rights is in the best interests of the child. . . . The dispositional phase, like its adjudicatory cousin, also must be supported on the basis of clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 207, 742 A.2d 415
(1999).
The following additional facts are necessary for the resolution of this issue. At about the time that DCF filed the instant petition, it modified the visitation between mother and son to therapeutically supervised visitation, at Yale Child Study Center. The respondent went to live with another foster family. She continued to visit with her son consistently. In her supervised visits, the respondent has manifested some progress in disciplining and setting limits for Shawn, but still is inconsistent in doing so.
The respondent attended a relapse drug program but withdrew from it in early 2000. Nonetheless, she has remained drug free since March, 1999. In February, 2000, the respondent gave birth to her second son, Caleb. Between April 26, 2000 and July 17, 2000, she and Caleb lived at Life Haven, a facility that provides rooms but not apartments. She was required to follow the rules of Life Haven which included doing chores, attending a work shop, participating in a parenting group, a job seeking group and a life skills group. She complied with these requirements. The respondent became employed for a short while at the Southern New England Telephone Company. She was unable to maintain this job, however, because of difficulty in arranging child care.
Personnel at Life Haven assisted the respondent in enrolling in the Thames River Program, which offers supportive housing to single mothers such as the respondent. However, on the day assigned for her to enroll, the respondent failed to do so. She informed personnel at Life Haven that she did not enroll because she had gotten a flat tire. In court, however, the respondent testified that she did not enroll because, when she arrived at the Thames River facility, she learned that male partners could cohabitate with their girlfriends, contrary to what she had been told.
On May 24, 2000, the respondent arrived at Yale Child Study Center for visitation with Shawn. On that day, an incident occurred in which the respondent, in Shawn's presence, lost her temper and became extremely hostile and threatening toward the DCF social worker. As a result of this incident and the pendency of the instant petition, DCF terminated her visitation.
After this incident and the termination of visitation, Shawn became very anxious and aggressive in school. He has had tantrums and has begun CT Page 13514 therapy at Yale Child Study Center.
At the time of trial, the respondent and Caleb were living with a man whom the respondent had met earlier in the year. She now wishes to stay at home with Caleb. She claims to have an unspecified disability and has applied for social security disability benefits. She is searching for a program that does not have a work or schooling requirement, and that provides housing and an income.
"The factors to be considered in deciding whether it would be in [Shawn's] best interest to permit further time for a relationship with [his] [mother] to develop include (1) the length of stay with [his] foster parents, (2) the nature of [his] relationship to his foster parents, (3) the degree of contact maintained with the natural parent, and (4) the nature of [his] relationship to [his] natural parent. . . . In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider." In re Kezia M.,33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993).
Shawn is now four years old; he will be five in January, 2001. He continues to live with the Craigs, with whom he has lived for all but the first five months of his life and the brief period during which he lived with his mother on English Street. He calls Mr. and Mrs. Craig "daddy" and "mommy." He also calls the respondent "mommy." There is no question that the Craigs love Shawn very much and that he is very much a member of their family. There is considerable distrust between the respondent and the Craigs. Each undoubtedly believes that Shawn should not be with the other. At some time in the past, the respondent confronted Mrs. Craig with the accusation that she was trying to take her son away. DCF's plan is to have the Craigs adopt Shawn.
The picture that arises from the facts found is of a mother who, if not "nomadic" as DCF contends, remains unsettled and unproductive, with an uncertain future, sliding into a state of permanent dependence. The foregoing facts and Shawn's need for permanent stability would suggest that granting the instant petition would be in his best interests. For the following reasons, however, the court is constrained to conclude otherwise.
First, in his first report, dated September 14, 1999, Dr. Green opined that "[t]he relationship between Shawn and his mother is excellent. They care for each other, show warmth for each other, and respect each other. . . . The degree of attachment that Shawn has with his mother is extremely high. She is a significant figure for him. . . . The CT Page 13515 interaction demonstrated that [the respondent] is certainly a very important psychological parent for Shawn. . . . Eventually reunification should be pursued. . . . Visitation should be increased in frequency. . . ." "`A psychological parent is one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent, as well as the child's physical needs. The psychological parent may be a biological . . . adoptive, foster, or common-law . . . parent, or any other person. There is no presumption in favor of any of these after the initial assignment at birth. . . .' J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of the Child (1979) p. 98."Temple v. Meyer, 208 Conn. 404, 408 n. 3,544 A.2d 629 (1988).
After Dr. Green issued his September 14, 1999 report, DCF provided him with additional information, including that Shawn had a significant bond with the Craigs, to whom he looked for comfort and safety, and that the Craigs were willing to adopt Shawn. Based on the additional information provided by DCF, Dr. Green concluded that both the Craigs and the respondent occupied positions of centrality in Shawn's emotional life, although Shawn was "more likely to seek out his foster mother for succorance [sic]." Dr. Green concluded: "Supervised visitation at the rate of one time per week should be continued, given the centrality of [the respondent] in Shawn's emotional world, and provided that [the respondent] remains substance free. Since there is an adoptive home available for Shawn, it would be denying him the necessary stability and acquisition of bonding skills if he were to be required to wait until [the respondent] has been clean an appropriate amount of time, relatively rehabilitated, and has progressed sufficiently in her understanding of appropriate parental practices. As he gets older, the window of opportunity closes quickly. Because of the centrality of his mother in his emotional life, an open adoption is strongly recommended." Notably, Dr. Green never met the Craigs or observed them in interaction with Shawn.
Second, the respondent has remained free of substance abuse and has never had any involvement with the criminal justice system. Indeed, her substance abuse appears to have been almost exclusively limited to the period of July, 1998 to March, 1999. She is limited by her intellect, maturity and psychological issues. These, however, do not prevent her from having contact with Shawn from which he emotionally benefits.
The third and decisive factor is that when asked by the petitioner's attorney what her plans were with respect to Shawn, Mrs. Craig answered, "Our plan is to entertain the possibility of adoption." (Emphasis added.) This did not appear to be an awkward choice of words by a nervous witness. It appeared to the court that Mrs. Craig was genuinely guarded CT Page 13516 in her response and that she did not wish to commit herself to adopting Shawn. If her intent was otherwise, her answer was not clarified by counsel.
Mrs. Craig's answer undercut a principle foundation of Dr. Green's opinion that the petition should be granted. Of course, Dr. Green's plea for an open adoption cannot be considered by the court. Open adoption, whether at common law; Michaud v. Wawrick, 209 Conn. 407, 551 A.2d 738
(1988); or by Connecticut's recently enacted statute; Public Act No. 00-228; is a consensual arrangement between an adoptive parent or parents and one or both biological parents. No such consent exists here. While it is not necessarily inconsistent to terminate parental rights in the absence of a pre-adoptive family, it would not be in Shawn's best interests to do so here given the respondent's centrality in his life and the respondent's ability, albeit limited, to play a constructive role in his emotional world.
This is not to say that granting the petition and terminating the respondent's parental rights may not, in fact, be in Shawn's best interests. The position in which the facts of this case leave Shawn is imperfect. Languishing in foster care is not in Shawn's best interests.In re Christina V., 38 Conn. App. 214, 660 A.2d 863 (1995). On the other hand, "[r]ecent studies of children in long-term foster care have provided evidence that suggests that `continued contact with the natural parent generally promotes the child's sense of well-being and emotional security' even for `children who were separated from their parents at a very early age and whose subsequent contacts with their parents are sporadic.' M. Garrison, `Why Terminate Parental Rights?' 35 Stan.L.Rev. 423, 461 (1983)." In re Jessica M., 217 Conn. 459, 466 n. 5, 586 A.2d 597
(1991); see also In re Alissa N., 56 Conn. App. 203, 211 n. 5, 742 A.2d 415
(1999), cert. denied, 252 Conn. 932, ___ A.2d ___ (2000). It is to say that the petitioner has not proved by clear and convincing evidence that terminating the respondent's parental rights at the time of trial was in Shawn's best interests.
BY THE COURT
Bruce L. Levin Judge of the Superior Court